**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| OONA O. SPERR,<br>*Plaintiff*,<br>v.<br>SID R. BASS and ALTHEA IRENE VIAFORA KRESS,<br>*Defendants*. | Case No. ____________________<br>**COMPLAINT**<br>**JURY TRIAL DEMANDED** |

Plaintiff Oona O. Sperr, by and through her undersigned attorneys, brings this action against Defendants Sid R. Bass and Althea Irene Viafora Kress, and alleges as follows:

## INTRODUCTION

1. This action arises from the decade-long partnership between Plaintiff Oona O. Sperr and Defendant Sid R. Bass that Sid abruptly abandoned and that Defendant Althea Irene Viafora Kress intentionally set out to displace—and from Defendants' ensuing effort to erase Oona from the life she built with Sid and to deprive her of the property, financial security, and legal and equitable rights that are hers as Sid's longtime partner.

2. For more than a decade, Sid lived with Oona after expressly agreeing in New York that, in exchange for Oona devoting herself to their partnership and shared life, he would share with her the ownership and enjoyment of their homes and other property and maintain her in the lifestyle they shared. Then, as Sid's cognition and judgment declined due to excessive consumption of alcohol and early signs of Parkinson's, Viafora Kress inserted herself into his and Oona's life, intentionally induced him to abandon and repudiate those commitments, displaced Oona from her and Sid's homes, and positioned herself to exercise control over Sid and property in which Oona has contractual or equitable rights. Viafora Kress now purports to be Sid's wife.

3. This action seeks relief against Sid for the legal consequences of repudiating his contractual obligations to Oona, and against Viafora Kress for intentionally interfering with those obligations and attempting to appropriate property which belongs to Oona or in which she holds contractual or equitable rights.

4. The scion of a legendary Texas oil family, Sid is one of the richest men in the world, with a publicly estimated net worth of approximately $4.4 billion, but which may in fact be closer to $6 billion. Since leaving Oona in late 2024 for Viafora Kress, Sid has breached his promises by refusing to provide Oona with the property interests and financial support he agreed she would receive (at levels commensurate with his extraordinary wealth and the standard of living they shared) in exchange for her years of devotion to their partnership and her enormous contributions to the life they built together.

5. Beginning in 2014, Sid and Oona lived together in a loving, committed relationship, during which Sid repeatedly expressed, reaffirmed, and fulfilled those promises, consistently assuring Oona that she would always be cared for as a permanent member of his family. Their lives were intertwined in every meaningful respect: they purchased properties in New York City, Pagosa Springs, Colorado, and Fort Worth, Texas, which Oona custom-designed to reflect their shared lives and unique needs; they merged their finances in significant part (including by sharing the same J.P. Morgan private bank credit account and combining their household and personal expenses); they planned their futures—including his will and end-of-life care; they tended to each other's health; they embraced one another's families; and they presented to the world as an enduring couple defined by mutual love, trust, devotion, and shared responsibility and partnership.

6. For many years, they were very happy as a couple. But beginning in late 2023, Sid—who had suffered at least three mini-strokes and was showing increasing signs of cognitive and physical decline (including frequent hand tremors consistent with his excessive drinking and a brain

scan showing signs of Parkinson's disease)—became increasingly erratic and more vulnerable to outside influence. Sensing an opportunity, in stepped Defendant Viafora Kress, who had been pursuing Sid since late 2022 under the pretext of seeking advice on how to invest a few hundred thousand dollars she had recently inherited.

7. But investment advice was not what Viafora Kress was really after. Unbeknownst to Oona, Viafora Kress began grooming Sid and, at some point, achieved her goal of a coercive relationship with him, with devastating consequences for Oona and Sid's partnership.

8. Viafora Kress's intrusion into the couple's life culminated the morning of September 3, 2024. After breakfast together at their home overlooking their ranch in Pagosa Springs, Oona sensed that something was off. When she gently asked Sid if something was bothering him, he replied flatly, "I want a separation. You are to pack and leave." Stunned, Oona listened as Sid—cold and detached—described the care, financial support, and property he would provide Oona following their separation. While those commitments were consistent with certain aspects of the parties' longstanding agreement—such as Oona's continued ownership and enjoyment of at least one of their homes—they materially understated the level of financial provision Sid had long promised to provide. To Oona's great dismay, however, Sid would later materially narrow even the commitments he made that September morning before ultimately repudiating some altogether and altering others beyond recognition.

9. Given Sid's well-known history of cheating on his previous wives, Oona could not help asking whether there was someone else. Sid vehemently denied it. But he was lying. Oona discovered the truth just a few weeks later, while packing up her belongings in Colorado, when she overheard Sid speaking loudly into his headphones as he paced back and forth. He was talking to Viafora Kress and calling her "sweetheart"—the term of endearment he had previously reserved for Oona. He promised Viafora Kress that he would, as she was insisting, never directly speak to Oona

again. In response to Viafora Kress's demands, Sid also promised her that not one of Oona's possessions would remain in the Pagosa Springs house. Shockingly, Sid even acceded to Viafora Kress's demand that he would not drive Oona to the airport when she departed the couple's home in Pagosa Springs (a promise to Viafora Kress that Sid would break—he saw Oona to the airport on September 30, the couple's last day together). It was clear from the conversation, and was later confirmed, that Viafora Kress would issue ultimatums threatening to leave Sid unless he complied with her demands. Oona was stunned to hear him confirm to Viafora Kress that she could move into Sid and Oona's Colorado home just days after Oona departed.

10. That September morning in Pagosa Springs marked a shocking rupture in Oona and Sid's partnership and life together and reflected the influence of Viafora Kress over a man whose cognition and judgment were deteriorating in the twilight of his life. It was a heartbreaking turn in a relationship that started with a conversation in a garden in Italy more than thirty years ago. In the summer of 1995, Oona, who volunteered with the American Academy in Rome, was asked to accompany Lily Auchincloss, an ailing Trustee of the Academy, on Auchincloss's final board trip to Italy. Sid was there as well, traveling with his then second wife, the socialite Mercedes Tavacoli Kellogg Bass, who was also a Trustee of the Academy. During a private tour of the magnificent gardens of the Giardini della Landriana estate, arranged for Trustees and their guests, Sid and Oona found themselves walking together and fell into quiet conversation as Mercedes marched ahead, absorbed in conversation with the estate's owner.

11. Though Sid and Oona had only just met, their conversation quickly took on an unexpected ease and familiarity as they discovered their overlapping connections to Fort Worth as well as their shared love of art. Oona knew Sid's hometown well; as a child, she had often visited her family there, including her beloved step-uncle Bill Bomar, a leading figure of the Fort Worth Circle, the progressive midcentury artist group that introduced modernism to the conservative North

Texas town. Sid, for his part, confided in Oona about the creative artist's life he had always dreamed of living, but said that his father's early retirement forced him to take the helm of the family's businesses sooner than he would have liked. Their interaction was brief, but meaningful. Years later, after Sid's second marriage to Mercedes Bass ended, the two would meet again, and that early moment of connection in Italy would grow into a loving partnership that would come to define the next decade of their lives.

12. In late 2011, Sid and Oona ran into each other again at Sotheby's, just two months after Sid and Mercedes publicly announced their divorce. Sid's second divorce had drawn intense media attention, even from the *New York Times*, owing in part to the notorious circumstances under which his relationship with Mercedes had begun: both were married when, in 1986, they began flirting at parties and stealing off to Paris for weekends at the Hôtel Plaza Athénée. When the affair was exposed, the resulting scandal became one of the biggest New York society tabloid stories of the 1980s. Sid's wife at the time—his first, Anne, whom the press had branded as "cold and imperious"[1]—promptly divorced him, at a cost estimated to be between $200 million and $500 million (the equivalent of roughly $600 million to more than $1.4 billion today). Sid would later tell close friends that by the time his divorce from Anne was near-final, he no longer wished to marry Mercedes, but it was too late to walk away.

13. Sid's divorce from Anne was then, and remains today, one of the costliest breakups in American history. But he never truly left Anne behind; she continued to haunt his thoughts. Decades later, as his drinking escalated to nearly two bottles of wine a day, Sid would publicly denigrate Anne, the mother of his only two children, and privately rage to Oona about Anne almost daily, rehashing old grievances with a compulsive intensity that suggested not merely lingering

[1] Michael Shnayerson, *"Something Happened At Anne's!"*, VANITY FAIR (Aug. 13, 2007), https://perma.cc/LNH5-LSKG.

resentment, but a deepening loss of judgment and emotional control. Even Anne's death from cancer in 2020 did not end his fixation.

14. Sid's subsequent divorce from Mercedes, like his separation from Anne, was also costly. In addition to a substantial lump-sum payment of an undisclosed size, the settlement provided Mercedes with lifetime annual allowances sufficient to sustain an undiminished ultra-luxury lifestyle. Among other obligations, Sid was required to fund the continued use and full upkeep—complete with extensive maintenance and security staff—of a huge estate in Fort Worth, a sprawling Fifth Avenue apartment in New York City, and a residence on Red Mountain in Aspen, Colorado, as well as private jet access and funds adequate to support the level of charitable giving necessary to preserve Mercedes's social standing.[2] Despite the scale of these commitments, Sid's fortune endured and grew unaffected. Sid often made remarks suggesting that, like many of the world's rich elite, his true net worth exceeds the multi-billion-dollar figures widely reported in the press.

15. Two days after their chance encounter at Sotheby's in December 2011, Sid invited Oona to a movie, followed by dinner at Boulud Sud on the Upper West Side. To her slight surprise, early in the evening, Oona realized that she was unmistakably on a date. That night, and over several evenings that followed that month, Sid spoke at length about his unhappiness during his marriage to Mercedes, and in particular the relentless social obligations that she had imposed on him. He told Oona that he was "finished" with the high-society life and that his sole desire was to lead a more pared down, quiet life as a painter—a passion he had long deferred in service of managing his family's fortune.

---

[2] *See* Maureen Callahan, *The Story Behind Sid & Mercedes Bass' Affair, Marriage and Surprising Split*, N.Y. POST (Oct. 16, 2011), https://perma.cc/J5X9-UAKT.

16. Oona enjoyed Sid's company and his unique ideas. She believed him when he said he was ready to live a quiet life and return to painting, and she was undeniably charmed by the man who kissed her goodnight and sent her beautiful roses the next day. Sid would later confess that Oona, who was markedly different from and more "down-to-earth" than Sid's previous socially ambitious wives, intrigued him.

17. After their brief courtship, Sid said he was returning to Texas for the winter. Over the next two years, they kept in touch on-and-off by email: Sid from Texas or Colorado as he sought privacy after his public divorce; Oona from New York or while riding Amtrak to Philadelphia, where her mother Portia lived and where she was working on a historic restoration project that would earn her national recognition.

18. In January 2014, Sid invited Oona to lunch at his townhouse on East 94th Street. Oona was pleasantly surprised to receive Sid's invitation and assumed it would be a chance to reconnect in person as friends. But apparently Sid had not stopped thinking about Oona over the intervening years, and he wanted to be more than just friends. Before lunch had ended, Sid asked Oona—half tenderly, half urgently—"How about you never leave?" And much to her own surprise, Oona agreed.

19. At that lunch in Manhattan, and in conversations in New York in the days and weeks that followed, Sid made clear, and Oona agreed, that they would build their lives together based on defined roles and mutual commitments. In exchange for Oona devoting herself full-time to their partnership by managing their homes and households, accompanying him wherever he traveled, and assuming primary responsibility for their shared life, Sid would provide for her financially, maintain her in the standard of living they established together, and share with her the ownership and enjoyment of the homes and other property they acquired during their relationship. Oona accepted the agreement in New York and substantially performed her obligations there, including by

overseeing work on the couple's two new homes on Manhattan's Upper East Side. In performance of the agreement and reliance on Sid's promises, she gave up her independent career as an interior designer and devoted herself full-time to the responsibilities Sid had asked her to undertake.

20. For the next decade of their lives, Oona found herself living in what she would come to think of as "Bass Land." Bass Land was a universe away from the more intimate, self-directed life Oona had known before. Sid has long enjoyed a life that reflects his extraordinary wealth. Over the years, his real estate portfolio has included multiple grand properties in Colorado, Texas, and Manhattan. Sid first made waves in the New York real estate market in the early 1980s, when he and Anne purchased, as a pied-à-terre, a nearly 10,000-square-foot apartment on Fifth Avenue for more than $6 million—a record-setting price at the time.[3] They commissioned Mark Hampton (Jacqueline Kennedy Onassis's interior designer who had known Anne from growing up in Indianapolis[4]) to style their new apartment—the symbol of their arrival on the New York social circuit. *New York* magazine breathlessly reported that "every painting in the dining room is a Monet."[5] Later, with Mercedes, Sid purchased a second Fifth Avenue apartment in one of the City's most exclusive co-ops,[6] which they decorated in "the maximalist aesthetic of Donald Trump."[7] The *New York Post* ogled: "Everything has been gold-leafed."[8] In more recent years, Sid has twice acquired Upper East Side townhouses for prices exceeding $24 million. Sid, an avid art lover who dreamed of becoming a painter, fills his residences with a personal art collection that rivals the

---

[3] Steven M.L. Aronson, *The Bolters: Sid Bass and Mercedes Kellogg Stun Society*, NEW YORK (Oct. 20, 1986), at 48.

[4] Jura Koncius, *Hampton's Courtly Style*, WASH. POST (July 30, 1998), https://perma.cc/D5D2-BZW8; Aronson, *supra* note 3, at 51.

[5] Aronson, *supra* note 3, at 48.

[6] *See Paul Allen Gets $25M Windows on UES*, OBSERVER (Oct. 3, 2011), https://perma.cc/Z3U7-W3Y8 (reporting on the Microsoft founder's purchase of a $25 million penthouse in the building, 4 East 66th Street, which is "no stranger to bold faced names," including "[o]il tycoon Sid Bass and his wife Mercedes").

[7] Callahan, *supra* note 2.

[8] *Id.*

quality of those of the world's leading museums, including pieces by Matisse, Picasso, Van Gogh, Rothko, and Warhol—many acquired by him for millions of dollars, and others that he inherited from his parents.

21. During their relationship, Oona and Sid lived together in a $26 million double-wide townhouse on a coveted Upper East Side block that Sid purchased with Oona at his side; an estate in Pagosa Springs, Colorado, with seven properties dotting the ridgeline and a 7,000-acre ranch spread out below; and a large loft apartment in the historic Montgomery Plaza in Fort Worth, created by combining and renovating three separate units in the building. They also spent holidays on San José Island, the Bass family's 21-mile-long private island off the Texas Gulf Coast that Sid's great-uncle purchased in the 1930s and that still serves as the family's beloved home and symbolic seat of their tremendous wealth and influence. This was the world Oona agreed to manage, maintain, and make into a home as Sid's partner.

22. Oona was not merely present for Sid's selection and acquisition of property during their relationship; she was deeply involved in the decision to purchase several properties and designed all the necessary renovations to customize the homes for Sid and Oona's life together. She worked alongside Sid in purchasing their Upper East Side townhouse on East 70th Street, and a multimillion-dollar house to the rear facing East 71st Street, which Oona planned to use as a guesthouse and studio. She also worked alongside Sid in purchasing an adjoining unit at Montgomery Plaza to expand their Fort Worth residence. Oona thoughtfully designed all of the properties she and Sid acquired together to be shared between them and to accommodate the practical realities of aging together—this included designing custom shelving in the kitchen, closets, and Oona's dressing room suitable for Oona's height, creating art studios for Sid where he could focus on his painting, and designing the guest room in their Montgomery Plaza add-on as a flexible suite, with a more accessible bathroom and room to accommodate potential live-in nursing care in

the future, reflecting Oona and Sid's expectation that they would spend the remainder of their lives together. These were among the many responsibilities Oona undertook in fulfilling the role she had agreed to assume as Sid's partner.

23. Sid and Oona also agreed that Oona's responsibilities would include managing their multiple shared households. Almost immediately, Oona found herself responsible for designing and monitoring the progress of renovations, long-term planning, and supervising staff, including housekeepers, landscapers, and security personnel.

24. Oona's responsibilities extended beyond managing the couple's homes. Consistent with Sid's expressed desire for a quieter life after Anne and Mercedes, Oona worked alongside him to create the more private and serene environment he wanted. In the early years of their relationship, Sid devoted himself to painting and produced a number of thoughtful and ambitious new works. Having grown up around artists and spent much of her life in creative circles, Oona knew what it meant to lead an artist's life, the discipline and solitude it requires, and she was careful to protect the long, uninterrupted hours Sid spent alone in his studio.

25. Though they lived more privately than Sid had in his earlier marriages, the couple did not withdraw from the world. They attended select cultural and social engagements together, including trips to Europe with the Museum of Modern Art, where Sid was on the Board, and visits with Sid's closest friends from his undergraduate days at Yale. They hosted small, intimate dinners with other couples in New York and Fort Worth (which they would cook themselves), welcomed friends and family to the ranch in Colorado, and gathered with family at the Bass compound on San José Island, where Oona collected seashells on the beach, sometimes alongside Sid, who always found the best and rarest shells. In every setting, they presented to friends, family, staff, and the broader world as permanent partners, and were embraced as such. Sid's grandchildren addressed

cards to "Grandad and Oona," while his former sister-in-law addressed her Christmas cards sent to the couple's New York home to "Mr. & Mrs. Sid Bass," telling gestures.

26. Life with Sid, however, was not without its bumps. Early in their relationship, the couple's decision to leave the townhouse on East 94th Street was driven in part by necessity: much to Oona's confusion and alarm, she and Sid found themselves being stalked and harassed by Sid's former lover, Patricia Zohn Pfeiffer, with whom, totally unbeknownst to Oona, he had conducted an affair during and after his marriage to Mercedes. Just as Sid had done to Anne, he left his marriage to Mercedes with another relationship already established. Pfeiffer, who lived only two doors away and whose husband was often in Los Angeles, had an uncanny ability to track the couple's movements; as soon as a car pulled around, she would materialize on the sidewalk outside Sid and Oona's house, standing silently watching as Sid and Oona stepped into the vehicle. Pfeiffer's behavior unsettled Oona deeply, and it soon became clear that remaining in such close proximity was untenable. The sense of being watched—of never quite knowing when Pfeiffer might appear to bang on the window of a restaurant where Sid and Oona were dining, or suddenly be walking alongside Oona—cast a persistent shadow over their daily routines in New York, so they began looking for houses further south in Manhattan. About a year after the stalking began, Sid met Pfeiffer at the Hotel Wales on Madison Avenue, where he presented her with agreements designed not only to secure her silence regarding the affair, but also to put an end to the stalking and harassment.

27. As Oona spent more time in "Bass Land," she also began to see the careful, sometimes strained calculations that governed Sid's movements. For example, Sid closely tracks the number of days he spends in New York in order to avoid being liable for New York taxes. The rhythm of their movements between New York, Colorado, and Texas was thus shaped both by their shared personal and family commitments, as well as by Sid's efforts to shelter his fortune from state

and local taxes, especially in New York. In contrast to New York, Sid was relatively careless about the amount of time he spent in Colorado. In the years before COVID-19, Sid and Oona extended their summers in Pagosa Springs into October, and by 2020 or 2021, Colorado was arguably their primary residence. In some years, Sid's time in Colorado exceeded the thresholds that trigger state filing obligations, yet he did not file Colorado returns. As Sid and Oona spent more and more time in Colorado, Sid dismissed Oona's concerns about tax obligations and told her to trust him, insisting that he was not on the radar of Colorado tax authorities.

28. Indeed, Sid is so resistant to paying taxes that he recently even had his employees attempt to misrepresent Oona's residence for 2025 to the IRS and state taxing authorities as being in Texas instead of New York, even though Oona spent all of 2025 in New York after Sid evicted her from the couple's homes in Colorado and Texas. Oona immediately rejected the plan and refused to participate in it. For years, Sid had told Oona that he was far more sophisticated and that she should trust him in such matters, but she had come to painfully learn that such trust had been misplaced.

29. Although Sid resisted paying taxes on his extraordinary wealth, he spared no expense on the lavish life he shared with Oona. The couple traveled between their homes—and to destinations around the world—aboard a private Gulfstream jet that Sid purchased in late 2017 for over $55 million, the interior of which Oona herself designed at Sid's request, outfitting the plane's interior with the finest materials, including Loro Piana fabrics and Hermès tableware. During their frequent travels—in hotels and restaurants from Santa Fe to Paris—Sid routinely and repeatedly referred to Oona with others as "Mrs. Bass."

30. Indeed, there was no question in anyone's mind that Oona was Sid's partner for life, far more than just a short-term or casual "girlfriend." During their decade together, Sid made that understanding tangible through gestures that were at once extravagant but also intimate evidence of

his deep and lasting commitment to Oona. For example, he purchased a 25.6-carat diamond for $2.1 million with a custom setting sized for Oona's ring finger. He also gave her a 20-carat emerald valued at $1 million—the same gemstone, he often noted, that he had given each of his prior wives. Sid also told Oona to choose from his late mother's extensive jewelry collection and heirlooms from Sid Richardson, Sid's great-uncle and the founder of the Bass family fortune. Oona picked out pieces not just for her, but for his branch of the family—items that were not only of significant monetary value, but also carried sentimental value. Oona believed that she would one day pass these family heirlooms on to Sid's daughters and grandchildren.

31. It was all a tremendous change for Oona, who before meeting Sid had lived more simply in her long-time studio apartment on Central Park West. Yet, although she became accustomed to them, the trappings of "Bass Land" were never what really mattered to her. Throughout her life, Oona had been around plenty of high-society individuals. But that is not what attracted Oona to Sid. Oona loved him for his gentler, artistic side—the part of him that had always wanted to be, and is, an impressive painter. Unimpressed by the pretense of high society, Oona was content to lead a quiet, more inconspicuous life with him. She was happiest cooking together with Sid at home, enjoying lively conversations over dinner with a few of their friends, observing wildlife, playing with their rescue cat, and connecting over their shared passion for art.

32. By their first summer together, Sid appointed Oona his health care proxy and granted her power of attorney in New York, Colorado, and Texas. Sid insisted that Oona, likewise, entrust Sid with those same responsibilities, which he still holds. Oona cared for Sid daily, doing her best to discourage him from drinking too much considering his advancing age and health issues, and at times accompanying him, at his request, to medical appointments in New York when Sid was afraid he might forget to ask important questions.

33. Sid also embraced Oona's family as his own. When Oona's mother's strength declined following a cutting-edge brain surgery in 2019, Sid arranged and paid for household management and, later, in-home essential care for Oona's elderly mother, Portia, promising to maintain that care for the remainder of Portia's life. Portia loves Sid and regards him as family; and Sid, until leaving Oona, told Oona and Portia that he considered himself Portia's late-in-life son-in-law. After Portia's 2019 brain surgery at the University of Pennsylvania, Sid donated $1 million to the university's Chief of Neurology, Dr. Sean Grady, to establish the Otto Sperr Neuro Oncology Research Fund, named in memory of Oona's father. At Sid's direction, Penn identified him, the donor, as "The Family of Otto Sperr."

34. And Oona expected to spend the rest of her life with Sid, devoted to his health and happiness. Their relationship unfolded in an atmosphere of mutual trust and affection, grounded in the shared understanding that their life together would continue until one of them died. Sid repeatedly affirmed that promise to Oona, assuring her that she was provided for and that his specific commitments to her would be honored. In fact, as a further sign of Sid's devotion to Oona, in 2017, Sid established a $10 million charitable trust in Oona's name. (Oona would later be shocked to see that Sid had invested the trust's assets in speculative stock market positions, and lost millions of the trust's assets at one point.)

35. As is his habit, Sid also arranged for Oona to be placed on the payroll of one of his companies, which he explained would allow her to fly on the private plane and provide her with health insurance in a tax efficient manner for him, even though Sid also paid all of Oona's medical co-pays and other out-of-pocket expenses. Every year for a decade, SRBI, L.P. provided Oona with an employee benefits enrollment election form, with Oona's elections already pre-populated to waive her entitlement to life insurance coverage, Accidental Death and Dismemberment ("A&D") coverage, and the company pension, among other benefits. When Oona raised the issue of planning

for her later years, Sid directed Oona to execute the enrollment form exactly as she had received it, explaining to Oona that she did not need life or A&D coverage because she would be provided for and that Sid would also financially support her mother, Portia. In reliance on Sid's reassurances, Oona submitted the enrollment form annually to SRBI, L.P., declining term life and A&D coverage each year.

36. It was Dr. Grady at Penn, to whom Sid donated $1 million to establish the Otto Sperr Neuro Oncology Research Fund, who later delivered devastating news to the couple about Sid's declining cognitive health. In 2019, after Sid suffered a small stroke while visiting Philadelphia, a battery of cognitive tests, including imaging, revealed atypical structural changes in his brainstem consistent with a "pernicious" form of Parkinson's disease. Oona sat in stunned silence as Dr. Grady explained his assessment to her and Sid in his office. In the weeks and months that followed, Sid, displaying his family's trademark secrecy, pride, and stubborn denial, did not speak of their meeting with Dr. Grady and its implications. Oona coped with her grief by intensifying her efforts to protect Sid's health, encouraging him to drink less, sleep more (without taking a prescription sleeping pill), and get back to painting, all with very limited success.

37. That depth of commitment and loyalty made Sid's sudden betrayal and abrupt expulsion of Oona from their shared life all the more shocking (though less so in hindsight as the scope of Viafora Kress's coercive manipulation of Sid has become clear). And his betrayal did not end there. Even when Sid ordered Oona to start packing her personal belongings at their Colorado home on September 3, 2024, Sid promised to provide Oona with a lump-sum payment of $50 million, the smallest of their New York homes, an additional property in a location of her choosing (which he added the following morning), continued support from Sid's secretary, accountants, and security staff, and continued care for her mother, Portia. Sid's September 3 promises reflected certain aspects of his and Oona's longstanding agreement—including Oona's continued ownership

and enjoyment of homes they had acquired together and Sid's continuing obligation to provide for Portia—but they materially understated the financial provision Sid had long promised Oona and did not fully honor his commitment to share in the property they had built together. But after Sid took Oona to the airport in Pagosa Springs on September 30 and Viafora Kress flew to Colorado to live in what had been Sid and Oona's favorite home, he would materially limit even those September 3 promises, some of which he withdrew altogether.

38. First, Sid sent Oona an email informing her that what he deemed to be her belongings from their Texas residence—including books, clothing, personal papers, family heirlooms, and other possessions of deep sentimental value—had been removed and placed into storage without her knowledge or consent. Oona would later learn that Sid similarly moved her remaining personal possessions in Colorado over state lines to a storage facility in Texas, again without her knowledge or consent. Sid gave Oona no advance notice whatsoever. It has since been confirmed that both actions were taken at Viafora Kress's direction. To date, Sid has never given Oona an inventory of what was packed, nor allowed her the opportunity to verify whether all her belongings from the homes she shared with him for over a decade were moved into storage without being first ransacked by Viafora Kress. Oona believes some of her possessions remain at Montgomery Plaza and in Pagosa Springs, mixed in with other items.

39. Later that same day, Sid emailed Oona a proposed "Maintenance Agreement," drafted by his counsel. Instead of the support Sid promised to provide Oona on September 3, the "Maintenance Agreement" replaced his offer of a single $50 million payment with annual $5 million payments over a ten-year term (thereby materially reducing both the reliability of such payments and their net present value), denied Oona ownership of any home, conditioned her housing on tenancy, rather than title, abandoned his commitment to pay for her mother's care, and suddenly added a new requirement that Oona submit to sweeping, one-sided non-disclosure obligations

intended to silence Oona so that he could (falsely) control the narrative of their relationship's abrupt ending—all while keeping Oona financially dependent on Sid.

40. In other words, what Sid was now proposing was that Oona—who had not only loved and cared for Sid for more than a decade, but who had also given up her own life and career in order to maintain their households and perform a host of other services for him in reliance on their agreed-to partnership—should be forced to depend entirely on Sid's increasingly unpredictable whims, or, even more troubling, on the preferences of Viafora Kress, his heirs, or his business associates if Sid should die or become otherwise incapacitated before 2035, when he would be 93 years old.

41. On August 22, 2025, a six-sentence email titled "News," sent to Oona in New York from Sid's email account stated that he had married Viafora Kress two weeks earlier.

42. What is more, Oona has since learned, based on the reports of multiple other individuals in New York, Fort Worth, Europe, and elsewhere, that Sid almost certainly did not compose or send that email. Upon information and belief, based on numerous independent accounts of the absolute control Viafora Kress has taken over Sid's life, including his electronic communications, Viafora Kress wrote the August 22 "marriage announcement," a likelihood that is confirmed by how little it resembles Sid's authorial voice. Her ability to announce her own purported marriage to Sid by assuming Sid's electronic identity was not an isolated episode; it is emblematic of the extraordinary degree of control Viafora Kress had by then obtained over Sid's communications and affairs.[9]

43. Viafora Kress's manipulation and control of Sid did not stop once she play-acted a ceremony purporting to make her Sid's wife. To the contrary, multiple individuals across a wide

[9] Sid once assured Oona that his email was safe from Viafora Kress because "she only knows Macs," not Windows-based PCs. The distinction was absurd—akin to saying someone who has always driven a Ford cannot drive a Chevrolet—and reflects how little Sid understood his vulnerability to Viafora Kress's control over him and his communications.

range of Sid's life, including long-time friends from Fort Worth, have conveyed to Oona, and to others, the extent to which Viafora Kress has systematically isolated Sid from many of those who knew him before she arrived, while progressively taking control of the people and channels through which Sid interacts with the outside world. She has refused to work with employees who, in her own revealing formulation, worked with Mercedes or Oona—an acknowledgment by Viafora Kress herself that Oona occupied the same position in Sid's life previously occupied by Mercedes. She has sidelined or caused the firing of longstanding employees and replaced them with people personally loyal to her, including a former doorman from the East 72nd Street building where Viafora Kress previously lived, with whom—according to persons familiar with their dynamic—she has an unusually close relationship. She took control of Sid's electronic communications and has composed and transmitted communications in Sid's name that Sid neither wrote nor sent. Multiple persons familiar with Sid and his affairs have independently reported the same disturbing pattern: as Viafora Kress's control has increased, access to Sid by the people who knew him longest has disappeared.

44. Viafora Kress has simultaneously begun treating Sid's extraordinary wealth as available for her own use. She has taken Sid on trips to Europe and spent millions of dollars, including purchases that became a subject of discussion among the many who observed them traveling, including in Paris. At the same time, Sid, under Viafora Kress's influence, has repudiated obligations to Oona that he honored and repeatedly reaffirmed for more than a decade, implausibly claiming that he lacks sufficient funds. Viafora Kress has thus not simply isolated an elderly man whose cognition and judgment were already declining; she has isolated him while simultaneously positioning herself to exercise ever greater influence over property in which Oona has contractual or equitable rights.

45. Oona cannot reconcile Sid's abrupt abandonment with the love and devotion he displayed for more than a decade without grappling with the role his cognitive decline likely played in his behavior. While Oona was planning for their shared future—managing final preparations for their long-anticipated completion of the interiors of their home on East 70th Street, building a greenhouse on their Colorado property to grow antioxidant-rich foods to support Sid's brain health and her own as she aged alongside him, and making arrangements in New York to accommodate whatever physical supports they may need in what was likely to be the last decade of their lives together—Viafora Kress inserted herself into Sid's life and capitalized on his decline. Her calculated manipulation of Sid makes Sid's repudiation of his and Oona's partnership agreement, and the dissolution of their relationship, all the more devastating, but under Viafora Kress's influence, Sid has made it abundantly clear that he has severed himself from the life he had built over a decade with Oona.

46. Oona, after profound heartbreak, is prepared to move on. She asks this Court to award damages arising from Sid's breach of his agreement with Oona and enforce the property interests and financial provision Sid promised her, award damages against Viafora Kress for intentionally procuring Sid's breach of that agreement, and grant equitable relief preventing Viafora Kress from retaining property in which Oona has contractual or equitable rights.

**PARTIES**

47. Plaintiff Oona O. Sperr is domiciled in New York, New York, where she attended Columbia University and built a small but respected interior design practice before entering into the partnership with Sid Bass that was formed in New York and is at issue in this action. In early 2014, while Oona was domiciled in New York, she and Sid agreed that, in exchange for Oona assuming the role they agreed she would play in their partnership, Sid would share the property they acquired together and provide Oona with financial support in accordance with the lifestyle they enjoyed

together. Their partnership was not episodic or casual, but continuous, public, and woven into the fabric of their respective families and communities. For over a decade, Oona and Sid shared homes, finances, daily responsibilities, and a fully integrated life in New York, Colorado, and Texas, consistent with the agreement they first entered in early 2014 in New York.

48. Defendant Sid R. Bass is domiciled in Texas. He is the heir to a multigenerational oil and gas fortune, and among the wealthiest individuals in the world. Sid has multiple residences in Texas, New York, and Colorado. He has maintained residential property in New York since the 1980s, when he purchased a Fifth Avenue apartment for more than $6 million, a record at the time. In more recent years, Sid has twice purchased Upper East Side townhouses for prices exceeding $24 million and, most recently, purchased a Manhattan penthouse for approximately $30 million, which he and Viafora Kress have routinely used since he left Oona. Beginning in early 2014 in New York, Sid made numerous promises to Oona to support, maintain, and provide for her in accordance with his lifestyle, share property they acquired during their partnership, and to financially support Oona's mother Portia. For more than a decade, Sid lived with Oona, moving with her between their homes in New York, Colorado, and Texas, all while reaffirming his promises of property and support—until he abruptly announced in Colorado that he wanted a "separation," ordered Oona to leave, and breached their explicit mutual agreement.

49. Defendant Althea Viafora Kress is domiciled in Texas. Viafora Kress has long kept a residence in New York, including at a property on East 72nd Street in Manhattan, and more recently, at the Manhattan penthouse that Sid purchased after his separation from Oona. In late 2024 or 2025, Viafora Kress changed her domicile from New York to Texas. Beginning in or around late 2022, Viafora Kress inserted herself into Sid's life under the pretext of seeking investment advice and thereafter intentionally cultivated a relationship with him while knowing that Sid and Oona had lived together for nearly a decade as life partners. Viafora Kress ultimately caused

Sid to remove Oona from the couple's homes, repudiate his longstanding obligations to her, restrict his communications with her, and replace her with Viafora Kress.

## JURISDICTION AND VENUE

50. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are diverse in citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.

51. This Court has personal jurisdiction over Defendant Bass pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) and New York CPLR §§ 301, 302(a)(1) and 302(a)(4). Sid entered into the agreement at issue in New York and repeatedly performed and reaffirmed his obligations under that agreement in New York. Sid conducted substantial financial and personal affairs in New York and, together with Oona, acquired, used, maintained, and extensively renovated multiple residences in Manhattan as part of the partnership at issue in this action. Sid also owns, uses, and possesses substantial real property in this district in addition to the East 70th Street and East 71st Street properties in which Plaintiff asserts contractual and equitable interests, and Plaintiff's claims arise from and relate to Sid's purposeful activities in New York and his ownership, use, and possession of those properties.

52. This Court has personal jurisdiction over Defendant Viafora Kress pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) and CPLR §§ 302(a)(1) and 302(a)(2), among other grounds. Viafora Kress personally committed acts in New York forming part of the tortious conduct alleged in this Complaint. In December 2022, while physically present in Manhattan, Viafora Kress met with Sid and Oona at the lunch through which she first obtained access to Sid under the pretext of seeking investment advice, acquired firsthand knowledge of Sid and Oona's longstanding partnership, and began the course of intentional conduct in New York and elsewhere that ultimately resulted in her procurement of Sid's breach of his obligations to Oona. Plaintiff's tortious-

interference claim arises directly from and relates to that course of interference initiated and continued here in New York.

53. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this judicial district and property that is the subject of this action is situated in the district.

## JURY DEMAND

54. Plaintiff demands a trial by jury on all issues so triable.

## FACTUAL ALLEGATIONS

### I. OONA ENJOYED A FULFILLING, INDEPENDENT LIFE IN NEW YORK BEFORE SID ENTERED HER LIFE

55. Oona was born in New Haven, Connecticut, where her father, Otto, was studying architecture at Yale University. Before she turned two, the family relocated to Philadelphia, Pennsylvania, where Otto practiced as an architect until his death at age 65. After his passing, Oona felt an extra responsibility for her mother, Portia, who is 96 years old and still lives in Philadelphia to this day.

56. After graduating from the Baldwin School in Bryn Mawr, Oona moved to New York and, following in her father's footsteps, studied architecture at Columbia University. Oona then studied art history and decorative arts in London before beginning her career as an interior designer. Oona was drawn to the human dimension of the work and the way thoughtful design could shape not only spaces, but relationships. Oona believed that design projects often required clients—particularly couples—to listen to one another and to make decisions collaboratively, and she took pride in guiding them through that process. She worked conscientiously within her clients' means, often finding that small, carefully considered changes could produce outsized results. Over the years, many of her professional relationships developed into close and enduring friendships.

57. In addition to being personally rewarding, Oona's work also earned her professional recognition. As one example, in 2018, she received a Trumbauer Award from the Institute of Classical Architecture & Art for her contributions to the restoration and renovation of the George C. Thomas House in Philadelphia.[10]

58. Oona's design career was an integral part of her fulfilling, independent life: she lived in an apartment on Central Park West, traveled extensively, and spent time with friends. She also devoted significant volunteer time to the arts, and in particular to the American Academy in Rome.

59. It was through the American Academy that Oona first met Sid. In the summer of 1995, she accompanied Lily Auchincloss, an ailing Trustee of the Academy, on what would be Auchincloss's final board trip to Italy. During a private tour of the Giardini della Landriana gardens organized for Trustees and their guests, Sid was present as well, traveling with his second wife, the socialite Mercedes Tavacoli Kellogg Bass (also a Trustee of the Academy), who walked several yards ahead of him in conversation with the estate's owner. Oona, who knew little of Sid and Mercedes, found herself walking near Sid, and they struck up a quiet conversation.

60. They soon discovered unexpected common ground. Oona spoke of her connections to Fort Worth, including her step-uncle Bill Bomar, a leading member of the Fort Worth Circle who had helped introduce modernism to North Texas. Sid immediately recognized Bomar's name and recalled that Bomar had once offered him encouragement and practical advice on his own youthful drawings. As they continued through the gardens, Sid confided to Oona that he had long dreamed of becoming an artist before family obligations required him to assume control of the Bass enterprise. In that brief exchange, he revealed a quiet, contemplative side of his nature that would later draw Oona to him when their paths crossed again years later.

[10] *2018 Trumbauer Award Winners*, Institute of Classical Architecture & Art, Philadelphia Chapter (Nov. 15, 2018), https://perma.cc/V82L-QGHT.

61. Oona's life in New York was comfortable, but unpretentious. She did not gravitate toward luxury for its own sake, preferring instead to browse thrift shops, where her trained eye and deep understanding of fashion allowed her to discover exceptional pieces by designers like Yves Saint Laurent that others had overlooked.

62. Although Oona never married during those years, she had a number of meaningful relationships, and she remained close friends with several former partners after those relationships ended. One former boyfriend, who lives in London, later met Sid through Oona and went on to serve as Sid's and his family's art advisor, and over the years, facilitated the purchase of art and antiques for Sid and Oona.

63. Oona was happy. Years later, however, Sid would cruelly disparage the life she had built before meeting him, dismissing it as small and insignificant (in his words, "nothing"), a characterization that stood in stark contrast to the independence, accomplishment, and quiet confidence that had defined her world before Sid.

## II. FOLLOWING TWO NOTORIOUS DIVORCES, SID COURTS OONA AND ASKS HER NEVER TO LEAVE HIM

64. Sid is the billionaire scion of a storied Texas oil dynasty. His great-uncle, Sid Richardson, established the family fortune after discovering one of the largest oil strikes in American history, the Keystone Field in West Texas. The *New York Times Magazine* described Richardson as a "cantankerous oil wildcatter" who "made multimillion-dollar deals on a handshake" and "helped bankroll Lyndon Johnson's climb from the Texas hill country to the White House."[11] Richardson frequently entertained then-Congressman Johnson and President Dwight Eisenhower, with whom "[h]e enjoyed a[n] … intimate friendship," and other powerful figures on San José

[11] Peter Elkind, *The Breakup of the Bass Brothers*, N.Y. TIMES Mag. (Nov. 24, 1991), https://perma.cc/62GD-G2FD.

Island, off the Texas Gulf Coast.[12] Richardson bought all 21 miles of the island in 1935 and transformed it into the family compound—"the seat of his empire and the manifestation of his power to bend events toward his interests."[13] The Bass family continued Richardson's tradition of hosting "political friends" they believed could advance or protect the family's interests in Washington, D.C.[14] In recent decades, Ed and Lee Bass continued this tradition by inviting highly influential fellow members of the Bohemian Club, the ultra-exclusive social club known especially for its "yearly bacchanalia" in the redwoods of California's Sonoma County.[15]

65. Sid—named for his great-uncle—was an able heir to the world that Richardson built. His father, Perry Bass, Richardson's nephew, grew up to become Richardson's business partner. Although Richardson would ultimately go on to leave the bulk of his fortune and his art collection to a foundation in his name, he also bequeathed a few million to each of Perry's four sons. Sid, the eldest of Perry's sons, dreamt of being an artist. Although a childhood visit to the New York Stock Exchange sparked an enduring fascination with the risk and thrill of financial markets, his deepest interest remained art. But long before completing a pedigreed education at Andover, Yale, and Stanford Business School, his father made it clear to five-year-old Sid that he was expected to take the helm of the family enterprise as soon as possible.

66. Sid's father Perry casts a long and damaging shadow over the lives of his sons to this day—Sid would later confide to Oona that Perry was an abusive alcoholic. As a child, Sid said, the family never sat down to dinner without bracing for his father's inevitable explosion—it was, he explained, "as though there was a grenade sitting in the middle of the table."

---

[12] Alan Peppard, *Islands of the Oil Kings: Part 2—A Fortress of Power Built to Last*, DALLAS MORNING NEWS (Dec. 11, 2014), https://perma.cc/4BHP-3AH6.

[13] *Id.*

[14] *Id.*

[15] Julian Sancton, *A Guide to the Bohemian Grove*, VANITY FAIR (Apr. 1, 2009).

67. As a businessman, Sid achieved considerable success, parlaying the multi-million-dollar inheritance he and his brothers—Ed, Robert, and Lee—received from their great-uncle into a diversified empire worth billions. In the early years of Sid and Oona's relationship, Oona was by his side as Sid negotiated the biggest deal of his life, the $6.6 billion sale of the Bass family's Permian Basin holdings to Exxon. At meals, Oona would listen to Sid as he shared his frustration with the incompetence of XTO Energy (an Exxon subsidiary), as he and Rex Tillerson (whom Sid called a "moron") gradually worked things out.[16] (Sid told Oona that he structured the deal to make his family exceedingly wealthy for all time, and that, in light of the future generational payments his family will receive, the deal's total value materially exceeds the widely reported $6.6 billion, though he declined to disclose this when friends remarked on the transaction.)

68. But not everything Sid touched turned to gold. In 2001, following what the press called "an embarrassing margin call," Sid was forced to liquidate his and his brother Lee's substantial stakes in Disney, at a loss exceeding $1 billion.[17] The humiliating Disney incident fueled widespread speculation that Sid's reputation as a financial whiz had been overstated. In fact, much of the Bass family's early success had been achieved with Richard Rainwater, whom Sid made the "family's investment manager" in 1970.[18] The press speculated that Rainwater was "the real brains behind the Basses' wealth," and after he resigned in 1986, it was said that the quality of the family's investment decisions deteriorated markedly, culminating in the billion-dollar Disney debacle.[19] *Vanity Fair* later traced that failure to impetuous choices Sid had made years earlier, observing that

---

[16] Christopher Helman, *Rex Tillerson's Last Deal? Exxon Mobil To Pay $6B To Bass Family For Permian Oil*, FORBES (Jan. 17, 2017), https://perma.cc/MQ9P-4BJN.

[17] Paul Tharp, *Bass on the Run; Unloads Disney Stake for $1B Loss*, N.Y. POST (Sept. 21, 2001), https://perma.cc/6TH7-KKQH; Gretchen Morgenson and Riva D. Atlas, *Bass Family, in Need of Money, Forced to Sell 6.4% of Disney*, N.Y. TIMES (Sept. 21, 2001), https://perma.cc/3KWY-FLJ9.

[18] Elkind, *supra* note 11.

[19] Suzanna Andrews, *Betting the Kingdom*, VANITY FAIR, Mar. 2002, https://perma.cc/3YZY-LBH9.

"the seeds of Bass's predicament [were] sown back in 1986," the year he both parted ways with Rainwater and, "in a first-class society scandal, left his wife, Anne, for the fun-loving Mercedes."[20]

69. Indeed, of all the controversies that touched Sid and the Bass family, none proved more damaging or humiliating than those arising from Sid's marriages, divorces, and repeated infidelities.

70. The most notorious of those scandals culminated in Sid's divorce from his first wife, Anne. That marriage ended after his widely publicized affair with Mercedes, which the *New York Post* described as "the kind of affair that very rich people conduct."[21]

71. Later, much of the notoriety surrounding Sid's subsequent divorce from Mercedes would stem from the fact that their relationship infamously began in infidelity when, in 1986, they met at a ball at Blenheim Palace in England. They soon began flirting their way through a summer of parties in the Hamptons (under the noses of their spouses, who attended the same soirees, and in front of Sid's two teenage daughters) and eventually snuck off for a weekend at the Hôtel Plaza Athénée in Paris, where an acquaintance from Texas spotted them holding hands.[22]

72. When the affair became public, it erupted into one of the most sensational tabloid scandals of 1980s New York. Sid's conduct did little to temper the spectacle. When Anne—whom *Vanity Fair* described as "either painstakingly polite or cold and imperious"[23]—called Sid in Paris the day after news of his infidelity broke, he flatly admitted to everything and coldly told her he wanted a divorce.[24] Later, it became clear that "the Basses' wasn't a happy home," in large part

---

[20] *Id.*

[21] Callahan, *supra* note 2.

[22] *See id.*; Aronson, *supra* note 3, at 51-52.

[23] Shnayerson, *supra* note 1.

[24] Aronson, *supra* note 3, at 51-52.

because Mercedes was not the first woman with whom Sid had been unfaithful: "Sid had had his flings."[25]

73. Anne and the couple's two young teenage daughters were ashamed and devastated by Sid's public and brazen infidelity. Meanwhile, after returning from Paris, Sid showed little concern and took up residence with Mercedes in a grand suite at the Carlyle, "dancing to cassettes, occasionally reaching into the refrigerator for caviar."[26] *New York* magazine gawked at the spectacle: "two middle-aged people . . . acting with the tonic heedlessness of teenagers."[27] Long before the ink had dried on his divorce papers, Sid and Mercedes were splashed across the society pages, apparently indifferent to the pain they were inflicting. The scandal struck a blow to the Bass family's carefully cultivated and guarded reputation for restraint and decorum. *New York* magazine observed at the time that Sid had "never stepped out of line before," and that his conduct "devastated" his parents because it undercut "the dignified manner" in which the Basses had always appeared to conduct themselves.[28] Years later, the *New York Post* would call the divorce "the highest-profile, most scandalous divorce on Park or Fifth Avenue," one that "left devastated spouses, children and financial planners in its wake."[29] Sid's divorce from Anne was also hugely expensive: it was widely understood that Anne received somewhere between $200 and $500 million—amounts that would equal roughly $600 million to well over $1.4 billion in today's dollars—which amounted to at least half of Sid's total net worth at the time and placed the separation among the most expensive in American history.

---

[25] *Id.* at 52.

[26] *Id.*

[27] *Id.* at 48.

[28] *Id.* at 52.

[29] Callahan, *supra* note 2.

74. Sid, for his part, was unchastened. He would later tell Oona and friends that by the time his divorce from Anne was nearing completion, he no longer wished to marry Mercedes, but felt it was impossible to walk away because he had caused her divorce. He would later confess to Oona, with an unmistakable glint of pride, that during the divorce, he had paid Anne's psychiatrist to inform Sid about Anne's sessions. Oona would later come to understand that Sid's confession revealed Sid's relentless need for control over the wives he discarded.

75. In 1988, mere weeks after his divorce from Anne became final, Sid married Mercedes in a lavish fête at the Plaza Hotel attended by a constellation of fabulously famous and well-connected guests—Henry Kissinger, William S. Paley, Lynn Wyatt, fashion doyennes Nan Kempner and Carolyne Roehm, and Oscar de la Renta, to name just a few.

76. Sid's eventual separation from Mercedes—more than two decades after their affair first became public—appeared outwardly more amicable. Publicly at least, the split was attributed to Sid's growing weariness with the demands of a relentlessly visible social life. Mercedes was widely regarded as the "Queen Bee of New York society," whereas Sid had become "eager to jettison all the New York frippery" and "never want[ed] to put on tuxedo pants again."[30] Privately, however, Sid's continued infidelity also contributed to the breakdown of the marriage, though Mercedes was never able to prove it conclusively. She often told Sid and others that he would never leave her unless there was someone else. What she did not know was that Sid had already been in a secret relationship with another married woman, Patricia Zohn Pfeiffer, the wife of the late architect Norman Pfeiffer, for some time—an entanglement that would soon unsettle his life once again. In 2014, Sid bragged to Oona about how brilliantly he manipulated Mercedes through their

[30] *Id.*

divorce, by sleeping in the same bed and maintaining their life together while promising her a future friendship he had no intention of having.

77. Sid's second divorce was also extremely costly. In addition to a substantial lump-sum payment of undisclosed size, the settlement provided Mercedes with lifetime annual allowances sufficient to sustain an undiminished ultra-luxury lifestyle. As one old acquaintance assured the *New York Post* at the time, Sid would "keep [Mercedes] in the life he brought her into."[31] Among other obligations, Sid was required to fund the continued use and full upkeep—complete with extensive maintenance and security staff—of a huge estate in Fort Worth, a sprawling New York City apartment, and a residence on Red Mountain in Aspen, Colorado, as well as access to private jets and funds adequate to support the level of charitable giving necessary to preserve Mercedes's social standing. Indeed, as recently as spring of 2026, Mercedes's contributions were highlighted on a large screen at Lincoln Center as patrons filed into the Metropolitan Opera's latest production of Wagner's *Tristan & Isolde*.

78. Barely two months after his divorce from Mercedes, Sid and Oona ran into one another again at Sotheby's in December 2011. Two days later, Sid telephoned and invited Oona to see a film, followed by dinner at Boulud Sud on the Upper West Side. When they arrived at Boulud Sud, the maître d' offered them a prominent table near the center of the room. Oona quietly declined and asked instead for a smaller table tucked toward the back, away from the restaurant's gaze. Her request seemed to delight Sid. It signaled, in a way neither of them articulated, a departure from the performative social life he claimed to be leaving behind.

79. As the evening unfolded, it became clear to Oona that Sid intended it to be a date. That night, and over others that followed that month, Sid spoke at length about his unhappiness

---

[31] *Id.*

during his marriage to Mercedes, and in particular the relentless social obligations it had imposed. He told Oona that he was "finished" with high-society life and that his sole desire was to return to painting, his lifelong passion.

80. Oona enjoyed Sid's company and was disarmed by what seemed to be his vulnerability. She believed him when he described his desire for a pared-down, quiet, more grounded life, and she was undeniably charmed by the man who kissed her goodnight and sent her beautiful roses the following day.

81. Sid would later admit that Oona—so markedly different from, and far more down-to-earth than, his previous socially ambitious wives—intrigued him. Oona made a particular impression one night when she took the subway downtown at midnight to meet Sid beneath the High Line in Chelsea, where Sid had told her he planned to spray graffiti. As Sid, disguised in a workman's vest and hard hat, was walking away from his freshly painted mark on 23rd Street, he spotted Oona walking toward him. Neither of Sid's previous wives would have been inclined to cross below 60th Street at midnight by subway.

82. After their brief courtship, Sid said he was returning to Texas for the winter. Over the next two years, they maintained a correspondence: Sid writing from Texas or Colorado as he retreated from the glare of his public divorce, Oona writing from New York or from the Amtrak to Philadelphia, where her mother, Portia, lived and where Oona was immersed in a historic restoration project that would later earn her national recognition.

83. In early 2014, Sid called Oona and invited her to lunch at his residence on East 94th Street—a townhouse once owned by the famous pianist Vladimir Horowitz, which Sid purchased anonymously in 2012 for approximately $24 million, a price so far above market value that it drew

significant media scrutiny and later led Oona to question whether, despite his reputation as a financial savant, he had been taken advantage of in the transaction.[32]

84. Sid's invitation to lunch at his home in New York followed an aborted attempt the week before, when Sid had asked Oona to meet him at Boulud Sud. He had arrived at the restaurant late, which was uncharacteristic for him, and appeared visibly flustered. Immediately upon arriving, he apologized and abruptly canceled the lunch, explaining that a friend had just been hospitalized and required his immediate attention. Oona accepted the explanation without hesitation. Only later would she come to suspect that Sid had, that afternoon, attempted to abruptly end his relationship with Zohn Pfeiffer, who did not take the shock of separation well.

85. When Sid renewed the invitation the following week, Oona assumed he simply wished to reconnect in person as friends. Sid, however, had not stopped thinking about Oona. During the lunch, in the quiet of the Manhattan townhouse, he turned to her and asked, with quiet urgency, "How about you never leave?"

86. At first, Oona did not fully grasp that Sid meant he wanted her to remain with him for the rest of their lives. But his intentions—and the commitments he was asking her to undertake, and promising in return—soon became unmistakable. Just as quickly, Oona realized that she was falling for Sid. He could be charming, thoughtful, and deeply affectionate—for over a decade, Sid never went to sleep at night without first telling Oona that he loved her. Those qualities made Oona feel safe, just as Sid intended them to.

[32] *See* Kim Velsey, *The Mysterious, Highly Lucrative Sale of 14 East 94th Street*, OBSERVER (Feb. 15, 2013), https://perma.cc/R3HS-X93R ("[T]he only remarkable thing about the townhouse at 14 East 94th Street was its price: more than $4,000 a square foot, which is among the highest prices ever paid for any townhouse in the city.").

## III. SID AND OONA LIVE TOGETHER IN "BASS LAND," PURSUANT TO THE TERMS OF THEIR AGREEMENT

87. Oona never left Sid after that lunch. Instead, in reliance on Sid's promises that he would provide for her, Oona committed herself to fulfilling her roles in the couple's partnership. She found herself living in what she came to think of as "Bass Land," where she and Sid functioned and were treated by others as devoted, permanent partners.

### A. Oona and Sid Divide Their Time Between Their Shared Residences in New York, Colorado, and Texas

88. Bass Land bore little resemblance to the life Oona had known before Sid asked her to "never leave" him. Sid insisted that she keep her 600-square-foot apartment on Central Park West, telling her, "You never know when you'll need to be back for a day or two." But Oona never returned. From their lunch in January 2014 until Sid abruptly ended the relationship in September 2024 to leave her for Viafora Kress, Oona and Sid lived together continuously, dividing their time between their shared homes in New York, Colorado, and Texas.

89. Sid and Oona shared a calendar that tracked holidays, medical appointments, travel, and social commitments. Unlike most couples, their calendar also meticulously recorded their physical location in any given week: "PS" for Pagosa Springs, "FW" for Fort Worth, and "NY" for Manhattan.

**Fig. 1. Oona and Sid's Shared Calendar from March 2024**




90. The amount of time Sid and Oona spent in each residence mattered to Sid for reasons beyond their personal preferences. Sid had long structured his movements among residences in different states to shield his fortune from New York state and local taxes, carefully limiting his time in New York to fewer than 182 days per year to avoid residency-based tax obligations.

91. During his relationship with Oona, however, Sid spent a couple of years in Colorado for periods sufficient to trigger state filing requirements. Rather than comply with those legal obligations, Sid simply failed to file Colorado tax returns. When Oona expressed concern, Sid brushed it aside, telling her to trust him in such matters and that Colorado was not paying attention.

92. Despite Sid's intention to avoid tax liability in Colorado, the couple's home in Pagosa Springs became, at points, the home where they spent the most time. Situated on a high plateau on the western slope of the Continental Divide, the property includes seven properties

arranged along a ridgeline overlooking a 7,000-acre ranch. Beginning in 2021 during the height of the pandemic, and in some of the years that followed, Sid and Oona sometimes spent more than half the year in Pagosa Springs, with the balance spent mostly in New York, and Texas a distant third.

93. In New York, in furtherance of their agreement, Oona became deeply involved in the couple's real estate decisions. In late 2014—less than a year after they began living together—Sid and Oona purchased a new residence on East 70th Street: a five-story, 12,000-square-foot mansion. They moved there in part because Sid's prior townhouse on East 94th Street was near the home of Zohn Pfeiffer, who had begun stalking Sid and Oona following the end of Pfeiffer's affair with Sid, which he had begun while still married to Mercedes. Pfeiffer, who lived two doors east on 94th Street and whose husband was often in Los Angeles, appeared to monitor Sid and Oona's movements with unsettling precision. As Sid and Oona departed their home on 94th Street for their first trip together, Pfeiffer appeared on the sidewalk outside the house. She stood there silently and waved very slowly as Sid and Oona's car pulled away. Pfeiffer established a pattern of materializing on the sidewalk whenever a car arrived, standing silently and watching as Sid and Oona stepped inside. Pfeiffer's strange behavior was deeply upsetting to Oona—who did not previously know of Sid's relationship with Pfeiffer, or that he had recently discarded her. It soon became clear that remaining in such close proximity to Pfeiffer was untenable. The sense of never knowing when Pfeiffer might emerge cast a persistent shadow over their daily life in New York. About a year after the harassment began, Sid arranged to meet Pfeiffer at the Hotel Wales on Madison Avenue, where he presented her with agreements designed not only to secure her silence regarding the affair, but also to put an end to the stalking and harassment that had made his and Oona's life feel increasingly exposed. As part of the arrangement, Sid offered Pfeiffer furnishings which Pfeiffer had selected and Sid had purchased at auction, and a Rodin sculpture valued at over $1 million.

94. Before purchasing the East 70th Street property, Oona and Sid toured numerous houses together, nearly all of which were listed for more than $40 million and as much as $55 million, despite requiring significant construction work. Among other houses, Oona and Sid toured: a 17,000-square-foot Italian Renaissance house at 19 East 70th Street—famously occupied by the Knoedler & Company art gallery before the gallery closed amid a massive forgery scandal, and ultimately bought by financier Leon Black for $50 million ($5 million under the seller's listing price)[33]; a 40-foot-wide neoclassical townhouse at 125 East 70th Street originally designed by Rachel "Bunny" Mellon, banker Paul Mellon's wife and an heiress in her own right[34]; and one of just three properties in Manhattan designed by famed architect Paul Rudolph that was once owned by the fashion designer Halston (the "Halston House")[35]. The 12,000-square-foot residence Sid and Oona ultimately purchased on East 70th Street—owned once by Condé Nast publisher Si Newhouse to display his vast art collection—was originally listed for $36 million. Although it was not Oona's favorite of the homes they viewed, it appeared to need much less work than the other houses and she recognized that Sid was drawn to its modernism, so she ultimately pushed for it. She could envision Sid's grandchildren spending time there and imagined converting an outdoor patio into a glass-covered painting studio for him, a vision that was later realized. After Sid expressed an openness to paying near the asking price, Oona persuaded Sid to take a tough negotiating position, and the couple ultimately acquired the property for below the new $26 million asking price, which was already significantly reduced from the initial list price.

---

[33] Jennifer Gould, *Finance guru Leon Black buying $50M UES Townhouse*, N.Y. POST (Aug. 13, 2014), https://perma.cc/HAN4-3WRW ("The manse … needs more than $20 million worth of renovations").

[34] Asta Thrastardottir, *Banking Heiress Bunny Mellon's New York Townhouse Is In Contract for $41 Million*, BUS. INSIDER (Oct. 10, 2014), https://perma.cc/H2BV-9FUJ.

[35] Haley Chouinard, *Manhattan's Famed Halston House Sells for $18 Million*, GALERIE (Jan. 28, 2019), https://perma.cc/2X44-3KEN.

95. Oona and Sid then purchased a home on East 71st Street—directly behind the East 70th Street property—to serve as a guesthouse. It was Oona who asked the couple's broker about the East 71st Street property after seeing that the two houses were connected by a door between their back-to-back gardens. The property was unique and perfectly aligned with their shared desire for an intimate life, one where, if they wanted, they could pass between the properties without ever stepping foot on the public street.

96. Sid was the named purchaser of both the East 70th and East 71st Street properties, but, as Sid expected and intended, Oona was integral to the couple's decision-making process, attending every showing, with or without Sid, and planning the nature and scope of renovations that would be necessary to customize the properties for their shared life together. Oona's years of work on the East 70th and East 71st Street residences were performance, in New York, of the role she had agreed to assume under the parties' agreement.

97. Even in late August 2024—within ten days of when Sid suddenly ordered Oona to pack and prepare to leave their home in Pagosa Springs—Oona and Sid viewed a third townhouse on the East 71st Street block, which they considered buying to house their New York head of security and his family. It was Oona's idea to find a home on their block in Manhattan for their head of security to live in. He was a trained medic, and with Sid's increasing tendency to have problems swallowing, Oona was comforted by the idea that security would be nearby in case of a medical emergency.

**Fig. 2. Oona's Notes on the Famed "Halston House" She and Sid Toured, but Did Not Buy**




98. Both the East 70th and East 71st Street properties Oona and Sid purchased together ended up requiring extensive renovation. Once the purchases closed, Oona—an experienced interior designer—planned and oversaw the work. Oona began furnishing the homes herself with items she bought at auctions and family furniture from Sid's mother. Sid supervised the hanging of art, but his contributions to their households' contents were occasional at most—a new gadget now and then, often soon abandoned. In their primary residence, Oona had her dressing room, linen closets, the kitchen, and pantry all improved for her taller-than-average height and life with Sid. Oona, who cares deeply about the properties and knows them better than anyone else, continues to

help their head of security in New York by providing information about the houses' design and structural history, even after Sid's betrayal. And the manner in which Sid's head of security, in turn, supervises the New York residences reflects the role he long understood Oona to occupy—not as a guest in Sid's home, but as Sid's partner. Indeed, when Oona disarms the alarm at the East 70th Street residence, security records reflect that the alarm has been disarmed by "user #001 Family," the same designation associated with Sid. Oona's designation in the system is fitting: For years, Sid's staff regarded Oona and Sid as a single unit, and, at Sid's direction, Oona was entrusted with the same access, responsibility, and authority over the residences as Sid himself. Indeed, Sid expressly told the couple's staff that "her [Oona's] word is to be treated as mine."

99. Oona and Sid jointly made other real estate transactions, as well. For example, Oona was behind the couple's decision to purchase a third apartment adjoining the two they owned in Montgomery Plaza in Fort Worth, allowing the couple to combine units and expand their living space. During their relationship, Sid also acquired an additional property on the ridge road above the Pagosa Springs ranch—but only after consulting with Oona first.

100. Like the properties they acquired in Manhattan, Sid and Oona's homes in Colorado and Texas were similarly customized for their shared life together. In 2014, Sid and Oona traveled to Fort Worth for the first time as a couple. When Sid showed Oona her bathroom and closet in their primary bedroom at Montgomery Plaza, he said: "I'm sure you'll want to change some things." The ceiling in Oona's dressing room was eventually raised to accommodate stacked hanging rods spaced for clothing long enough for Oona's 6'2" frame. In each of their homes in New York and elsewhere, Oona made ongoing improvements aimed at making their homes safer and more accessible in the years ahead—installing night lights, step lights, and grab bars.

101. Given Sid's passion for art, his homes display museum-quality art pieces, and Oona became used to living with hundreds of millions of dollars' worth of art on the walls. As but one

example, the couple's bedroom in New York was adorned with a Van Gogh that art dealer and gallerist Bill Acquavella valued at $150 million. And during their relationship, Oona selected a Léger and a Guillaumin from Sid's parents' collection for Sid and Oona to keep for themselves during their lives, and to one day pass on or sell for the benefit of his family foundation.

102. Given the size and complexity of their properties, Oona found herself deeply involved in planning the couple's household operations, including housekeeping, landscaping, and security, and making decisions about ongoing repairs and improvements. In turn, Oona and Sid's household staff treated her as Sid's partner in running the household. Staff routinely turned to Oona for guidance on matters large and small, asking questions such as whether Mr. Bass's pants should be hemmed before an upcoming trip, whether he preferred his dry cleaning unwrapped before being placed in his closet, or whether a substitute brand should be purchased when his preferred peanuts were unavailable.

103. Oona also managed the storage and preservation of the extensive collection of antiques that Mercedes had acquired, which was later supplemented to include furnishings and heirlooms from the family's island ranch, from Nancy Lee Bass's home after her death, and from Oona's family home in Philadelphia.

104. Managing and planning their households effectively became Oona's full-time job, which she accepted given that she and Sid had, at the outset of their partnership, agreed that life in Bass Land would require Oona to relinquish her interior design career. Although the sacrifice was significant, Oona embraced her new role, which used her professional skills. She formed close working relationships of mutual respect with the couple's staff across the country, who, later, could not hide their shock at Sid's abrupt eviction of Oona given her obvious and extensive love, loyalty, and devotion to Sid.

105. Oona also contributed to the already underway redecoration of the Bass family compound on San José Island, the home to which the entire family attaches great sentimental value. Oona understood the unique and important history of San José Island, and she approached the situation with the care and respect of a preservationist. Treating Oona as one of their own, the family respected Oona's contributions. In one emblematic email exchange with Sid's brothers, Ed Bass referenced a tapestry discovered in the basement of the main house and remarked that "Oona is wild about it and thinks it should be used" in the renovation, "perhaps on the west wall of the dining room to the right of the fireplace." Seeing the dim and unimproved staff rooms, Oona also set about buying furniture to make them more comfortable.

106. During this process, Oona was shocked when, while reviewing expenditures with Sid, she discovered that the decorator that Ramona Bass—Sid's sister-in-law whom Oona considered and referred to as her sister-in-law too—had hired for the project, Leta Austin Foster, had stolen furniture from the 1980s redecoration of the house and overcharged the family by more than $2 million for fabrics. This underscored the degree to which Oona was entrusted with—and expected to fulfill—the responsibilities Sid had given her as she tried to protect Sid and their family. Oona advocated for corrective action, but the Basses, ever determined to avoid public embarrassment above all else, refused to take any action against the decorator.

107. That same sense of responsibility carried through to every aspect of Oona's caring for Sid. Throughout this period, she devoted herself to improving Sid's quality of life. Nowhere was that more evident than in Sid's favorite home in Pagosa Springs, where Oona quickly converted the central rooms of a guesthouse on the property into Sid's art studio, so that he could pursue his life as an artist, the creative passion that had first drawn her to him.

108. In the early years of their relationship, Sid devoted himself to painting and produced a number of impressive canvases, panels, and prints. Having grown up around artists and spent

much of her life in creative circles, Oona understood the discipline and solitude that an artistic life demands. She carefully protected the long, uninterrupted hours Sid spent in his studio, structuring their shared routines to give him the space he needed to work.

**Fig. 3. Painting by Sid Bass that Hangs in the East 70th Street Townhouse**



**Fig. 4. Self-Portrait by Sid Bass**



109. Not all of Sid's work was grand in scale. He also turned his brushes toward the intimacy of their own relationship, painting small tokens that reflected his affection for and commitment to Oona and the life they were building together, including painted Valentine cards Sid gave to Oona every year.

**Fig. 5. Valentine for Oona from Sid**



110. The homes they shared were the physical setting of a deeply intertwined life. Oona began every morning by arranging Sid's breakfast tray of hot coffee, dairy-free yogurt, and berries, and she prepared lunch when they were home midday. For dinner, Sid and Oona loved to cook together, and they hosted occasional small gatherings of family and friends at each of their properties. Oona prepared salads and sides, leaving Sid to proteins and sauces. It was Oona's job to ensure their homes were always stocked with basic pantry items, and to find places to store the specialty spices and the ingredients Sid often ordered in quantity.

111. Oona also saw to Sid's wardrobe. She routinely shopped for his clothing and kept him outfitted for their shared life—everyday chinos, informal linen shirts, and sneakers; the fishing shirts and protective hats he wore in Colorado; and sometimes jackets and sweaters from Neiman Marcus.

112. Oona ran their households to fit the couple's remarkably unremarkable life at home together. In Pagosa Springs, instead of having Sid's staff cook and wait on them at the dinner table (as Mercedes had instructed them to do), Oona set the table and loaded the dishwasher herself. When Oona first arrived in Pagosa Springs during Easter in 2014, she was embarrassed that the two longtime staff in Pagosa were waiting on Oona and Sid hand and foot, and she also knew that Sid had settled into the privacy of their life. Oona was content to do the day-to-day cooking and tidying-up around the house necessary for Sid to have the life he wanted. Oona immediately set out to run their home, in her words, "family style."

113. Oona made other changes to their home in Pagosa Springs to reflect her and Sid's shared life together. When Oona's long-time friend John Solecki and his wife visited from New York, Oona installed a deck outside their best guest room with steps leading in the direction of the main house, so that their guests could sit outside in the privacy of their own porch. She also made

alterations for their grandchildren, including opening the ceiling in the children's bedroom to create a loft where their grandsons could stay up late.

**B. Oona and Sid Were Known and Treated by Family, Friends, and Staff as Committed Lifelong Partners**

114. The way Oona and Sid lived together at home was mirrored in how they were understood by everyone around them. Although their life together was less publicly performative than Sid's prior marriages—reflecting both Oona's preference for a quieter life as well as Sid's desire for privacy after his high-profile social life and tumultuous divorces—they nonetheless maintained a cherished circle of friends and family.

115. Oona and Sid's social life in New York centered in many respects around the Museum of Modern Art ("MoMA"), where Sid served on the Board. Oona and Sid socialized in New York with members of the Board and their spouses and traveled with MoMA groups on MoMA-organized trips to Paris, Vienna, Venice, and Chicago. On occasion, Oona was invited to participate in MoMA meetings open to members' spouses, including a Board meeting in Chicago in 2015 and a meeting of MoMA International Council members and their spouses in Vienna in 2024.

116. Among their MoMA friends, it was often remarked how much Sid cared for Oona and how happy and at ease she made him. Sid secured institutional privileges for Oona reserved for spouses by obtaining a card for Oona that identified her as a MoMA Trustee (which she is not), granting her preferred access to the museum. He similarly arranged for a card in her name at the Metropolitan Museum of Art, gave her a Sotheby's Preferred card in his name, and shared a "family" membership with her at the Guggenheim and also at the Amon Carter Museum.

117. Sid and Oona's MoMA circle, in turn, regarded Oona as Sid's partner. In or around 2016, Alice Tisch, then-Chair of MoMA's Design Committee, invited Oona to join her committee—a testament to Oona's prominent place, alongside Sid, in the MoMA community. Several years

later, in Vienna in 2024, Alice quietly informed Oona that she had heard through the Yale grapevine that Ed Bass and his wife, Sazcha Camacho, were arriving at the Sacher Hotel. Sid and Oona had been effectively estranged from Ed since his marriage to Sazcha in 2018, and Alice knew the news of their arrival in Vienna would upset Sid. Instinctively turning to Oona, Alice informed her so that Oona could navigate the situation with care and discretion for Sid.

118. In addition to their friends on MoMA's Board, Oona and Sid also spent time with Sid's closest friends from his undergraduate days at Yale, a group that dubbed themselves "The Blind Nine." The group had spread across the country and was hard to gather in one place, but when they were together, these men, like Sid's MoMA circle and old friends from Fort Worth, remarked that Sid seemed happy and back to being himself—not the nervous wreck he had been with his previous wives. These accomplished men are among Sid's oldest and most enduring friends. Both Sid and Oona cherished time together as a group with the men and their wives. Indeed, for Oona, the purpose of designing their East 71st Street house in Manhattan as a guest house was significantly about spending time with these dear and real friends. Oona was first introduced to The Blind Nine at a memorial for one of the members in 2014, but happier times with the men and their wives followed, including Sid's 50th Yale Reunion, a weekend Oona and Sid hosted at San José Island, and a trip to Charleston in 2023.

119. Sid and Oona also socialized in Texas when they were there, visiting, dining, and attending social events with husband-wife couples from other prominent Fort Worth families, including the Moncriefs, the Marions, the Hallmans, the Hudsons, and the Blakes. Oona regarded Sid's friends in both New York and Fort Worth as among her own dear friends. At the same time, Sid viewed Oona's participation in their social engagements as part of the terms of their partnership. On the rare occasions when Oona was unable to attend a social event with him, Sid held it against her. Sid raged months, and years, after a particular dinner in 2022, when Oona could not accompany

him to Bill and Donna Acquavella's apartment in New York. Oona had cold symptoms and feared exposing others to illness. But Sid was unwilling to believe that Oona was disappointed she could not go.

120. As in New York and Colorado, Oona and Sid's friends in Fort Worth viewed and treated them as a committed, permanent couple. With their close friends, recognition of the nature of their relationship was understood: when, for example, Oona would attend a dinner party wearing the emerald ring Sid gave her, everyone knew Sid had given her the ring and what it signified. In public settings, Sid would introduce Oona, and then the person to whom Oona was introduced would thereafter casually refer to her as Sid's wife or partner. That was how Oona was regarded among Sid's longtime friends in Fort Worth. Indeed, Oona was one of just two non-blood members of the Bass family—the other being Ramona Bass, the wife of Sid's brother Lee—to whom the family entrusted jewelry from Sid's late mother's collection.

121. Early in their relationship, in February 2015, they attended the private opening of an exhibit of Sid's parents' art collection at the Kimbell Museum in Fort Worth—an event many family members attended. At the event, Kay Fortson, Kay Kimbell's niece and longtime president of the Kimbell Art Foundation, took Oona's arm and walked around with her in recognition of Oona's place in Sid's life. Until 2018, when Ed married Sazcha Camacho, the Basses always gathered at the family compound on San José Island for Thanksgiving.

122. Oona was mindful of Sid's two adult daughters and cautious not to intrude on their relationship with their father. She empathized with the deep pain caused by Sid's highly public divorce from Anne and wanted to encourage and respect the time they spent with their father. Notwithstanding any feelings Sid's daughters may have had about women in their father's life following Anne, they and their families made yearly visits to San José Island with Oona and Sid over Presidents Day weekend and, in some years, for Easter or Thanksgiving. One of Oona's few

fond memories from the days immediately after Sid ended their relationship in 2024 was a four-day visit his grandson made to Colorado. The three of them had a wonderful time together, even though, in the quiet moments, Oona was in tears while packing and preparing to leave the couple's shared home on September 30.

123. While Oona took care not to overstep, Sid's daughters and grandchildren treated her as part of the family. Sid's daughter Hyatt sent Christmas cards addressed to "Daddy and Oona," often accompanied by thoughtful gifts—such as books Hyatt described as reminding her of "the two of you" because they were "about architecture & design as well as plants":

**Fig. 6. 2017 Christmas Card from Hyatt**



Daddy + Oona,
These books are some of my favorite finds of the last year (both through Nate!) and they reminded me of the two of you. They are both very much about architecture & design as well as plants. I hope you love them like I do! Merry Christmas!
Love, Hyatt

Sid's grandson likewise sent holiday cards addressed to "Grandad and Oona," including the below note he made at school and signed with "Love, [J.]":

**Fig. 7. 2017 Christmas Card from Sid's Grandson**




124. Even extended family members addressed Oona and Sid as a couple in a way that reflected the permanence of their partnership. For example, Vicki Bass Morrow—Sid's brother Ed's former wife—sent Christmas cards to Sid and Oona at their home in New York addressed to "Mr. and Mrs. Sid Bass":

**Fig. 8. 2022 Christmas Card from Vicki Bass Morrow**






125. In addition to the time they spent in New York, Colorado, and Texas, Oona and Sid frequently traveled all over the country and across Europe—from London and Paris to Venice and Vienna—as well as to be with Oona's friends in Mustique and Cape Town and to visit Freck and Sandra Vreeland in Morocco. Italy—where Sid and Oona first connected in the summer of 1995—was always a favorite. They flew on Sid's private jet, first a Falcon and then a Gulfstream G500 he purchased with Oona by his side for over $55 million.

126. Oona and Sid worked together as a team to design the Gulfstream. Sid meticulously planned the jet's eye-catching striped exterior paint, and at Sid's request, Oona worked closely with Gulfstream to design the jet's interior with cashmere from Loro Piana, tableware from Hermès, and custom carpets and seat quilting. His expectation that Oona would design the interior of the new aircraft was entirely consistent with the role he expected her to occupy throughout their life together.

Oona set out to preserve elements of Sid's beloved Falcon, while at the same time creating something even more beautiful.

**Fig. 9. Agenda from Gulfstream Design Meeting and Thank You to Oona for her Business**



AGENDA

Dear Ms. Sperr,
Thank you for your business. Congratulations!
Your aircraft delivery team,
Courtney, Susan & Dean

GULFSTREAM AEROSPACE WELCOMES
SRBI, LP

AGENDA **Wednesday, April 25, 2018**

Customer Arrival at SDC

Welcome and Introductions

Material Review

Lunch

Material Review Continued

Tour G650 Mock-up

Tour Production

Q & A / Wrap-up

Depart from Sales & Design Center to Downtown

Return to Sales & Design Center from Downtown

Customer Departure

**GUEST ATTENDEES**

Ms. Oona Sperr
Mr. Anthony Verschoyle
Mr. Broc Chambers
Mr. Brandon Williams

**GULFSTREAM ATTENDEES**

Susan Wetmore,
Customer Delivery Executive

Courtney Carroll
Principal Designer

Aaron Smelsky
Sales Engineer

**Transportation provided by:**

Above & Beyond Limo
912.236.9114
Driver - Emmitt Scott
912.272.3886

**CONTACT INFORMATION**

Janet Campbell
Visit Planner
Sales & Design Center
Office : 912.395.8128
Mobile: 912.441.3776

For security purposes, any changes to your proposed attendee list require a 24 hour notice.
Due to company policy, no photography is permitted at the Gulfstream facility.

Gulfstream™
A GENERAL DYNAMICS COMPANY

**Fig. 10. G500 Sid Purchased with Oona, in One of the Bass Family's Hangars**



**Fig. 11. Venice, November 2015**



**Fig. 12. Nebraska, Solar Eclipse Viewing, August 2017**



**Fig. 13. London, June 2023**



127. At one point in their relationship, Sid began insisting that he complete the joint customs form on their behalf upon arriving home from a foreign country. The customs form was emblematic of how Oona and Sid presented themselves during their travels: when checking into hotels—from the Bristol in Paris to the Cipriani in Venice—and dining at restaurants or browsing stores across Europe and elsewhere—Sid referred to Oona as "Mrs. Bass."

**C. Sid Fused His and Oona's Financial, Medical, and Legal Lives**

128. From the very outset of their relationship, Sid took steps to intertwine his and Oona's financial lives. Within two weeks of their lunch in New York in January 2014, Sid gave Oona a credit card issued in her name and linked to his account. When Sid handed Oona the credit card in the kitchen of the townhouse on East 94th Street, he told her: "You will be needing this to make a lot of household purchases." The account to which the credit card was linked became the couple's

joint account and, as Sid explicitly directed, Oona used it both for her personal purchases as well as the couple's day-to-day needs.

129. Sid paid all of Oona's bills, with the exception of her cell phone bill and expenses associated with her Central Park West apartment (such as utilities). In practice, however, even those limited obligations were handled by Sid's staff. His longtime secretary, Vicky Stewart, and later her successor, Tina Sapp, oversaw Oona's personal bank account and coordinated payment of her telephone, utility, and maintenance bills. Sapp, along with Sid's Chief Financial Officer, Thomas White, were—and remain—authorized signers on Oona's accounts, and Oona's bills are still sent to Bass Brothers Enterprises. Sid made clear to Oona that White and Stewart were to take care of managing her financial affairs, so Oona could travel with Sid and focus on fulfilling her duties as his partner, as he and she had agreed.

**Fig. 14. September 2023 Statement for Oona's Personal Wells Fargo Account**


September 30, 2023
WELLS FARGO
The Private Bank
Private Bank Interest Checking
Questions? Please contact us:
The Private Bank Service Team
Available 24 hours a day, 7 days a week
We accept all relay calls, including 711
Phone: 1-877-646-8560
Online: wellsfargoprivatebank.com
Write: Wells Fargo Private Bank
P.O. Box 4056
Concord, CA 94524-4056
EONCKCDHGK 000607
OONA O SPERR
TINA M SAPP
THOMAS W WHITE

130. Sid also arranged for Oona to be placed on the payroll of one of his companies, SRBI, L.P. Sid explained that her employment by SRBI, L.P. was necessary for Oona to be able to use the private jet, and that the arrangement would allow him to provide her health insurance in a tax efficient manner for him, even though Sid also paid all of Oona's medical co-pays and other out-of-pocket expenses. The position came with an annual salary of $250,000, which was deposited into a Wells Fargo account Sid's staff established in Oona's name. When Sid's secretary asked

Oona if she wanted an ATM card to make cash withdrawals or transfers from her Wells Fargo account, Sid told Oona that she had no use for one. His reasoning was clear—Oona would never need to take out cash, because Sid would always be there. And Sid gave her no reason to doubt he would fulfill his promises of much more significant and permanent financial support. Indeed, he had given Oona access to his own accounts and cash in accordance with their agreement. Consistent with Sid's repeated promises and actions, Oona understood that her financial security would come from their partnership, not from accumulating independent savings.

131. Every year, SRBI, L.P. provided Oona with an employee benefits enrollment election form, with Oona's elections already pre-populated to waive her entitlement to life insurance coverage, A&D coverage, and the company pension, among other benefits. Sid directed Oona to execute the enrollment form exactly as she had received it, explaining to Oona that she did not need insurance or the pension because what he would provide her was far greater. If she predeceased her mother, Sid would financially support Portia, and if Oona ever suffered an injury in a covered accident, she would have more than sufficient resources to independently afford any costs for treatment and care. In reliance on Sid's reassurances, Oona submitted the enrollment form annually, declining term life, A&D coverage, and the pension each year.

132. Oona was also involved in some of Sid's philanthropic work and, as expected and requested by Sid, participated alongside him in those efforts. She attended annual meetings with Dr. Douglas Koch, whose ophthalmology research at Baylor College of Medicine Sid funded, and introduced Sid to her friend Eva Moskowitz and Moskowitz's organization, Success Academy Charter Schools, in New York City. After Sid gave $25 million to Success Academy, Sid and Oona were invited as a couple to join the organization's board. At Sid's request, Oona also worked with Pete Geren, the Sid W. Richardson Foundation's President and Chief Executive Officer, to evaluate a project the foundation was considering.

133. In addition to their intertwined finances, Oona and Sid relied on one another for health-care decision-making. Within their first year together, Sid had documents prepared that designated each other as health care proxies in New York, Colorado, and Texas, and they routinely listed one another as emergency contacts on medical and other official forms.

134. Oona and Sid's care for each other manifested in areas far beyond paperwork. As the years went on, Sid had Oona increasingly participate in his medical care, including accompanying him to some medical appointments. In May of 2024—just a few months before Sid ended their relationship and abruptly told Oona to leave—Sid required emergency surgery while the couple was in Rome. Between waiting to be seen, the surgery itself, and Sid's immediate post-op recovery, the ordeal lasted more than 16 hours. Throughout it all, Oona stayed as close to Sid as circumstances allowed—at his side when she could be, and otherwise waiting nearby in the chaotic, foreign ER waiting room. When they returned to New York, Sid asked Oona to accompany him to his follow-up appointment, explaining that he was afraid he might forget important questions and that he trusted her to advocate for him.

135. Sid's staff also turned to Oona to raise scheduling matters and concerns related to Sid's health and safety. When Sid was due for a colonoscopy, Sid's secretary reminded Oona, so Oona could nudge Sid to schedule the appointment. Even in the early years of their relationship, Joel Glenn, Chief of Sid's security operation, took Oona to lunch each year to discuss the dangers of Sid's practice of fishing alone in Pagosa without a medic or sharpshooter. Knowing that Sid would not allow this intrusion on his privacy anytime soon, Oona took basic first aid training and taught herself to avoid deadly interactions with mountain lions and bears.

136. Oona and Sid also granted one another powers of attorney. Sid continues to hold power of attorney for Oona to this day.

137. These arrangements reflected the couple's agreement that, in exchange for Oona's responsibilities and commitments to Sid, which included assuming medical and legal authority for Sid and structuring her life around mutual dependence and long-term care, Sid and Oona shared financial resources. There was no misunderstanding that they were bound together in a lifelong partnership, not as casual companions.

**D. Sid Performs and Reaffirms His Commitments to Oona**

138. From the beginning of their relationship, Sid gave Oona expensive, thoughtful, and deeply personal gifts. For their first Christmas together in 2014, Sid purchased Oona an 18-karat gold dolphin cuff bangle from David Webb, who had long been a favorite designer of Sid's late mother, Nancy Lee Bass. The piece cost $20,000, and the invoice reflected the sale was to "Oona & Sid R. Bass":

**Fig. 15. 2014 Receipt for David Webb Christmas Gift**



MACKLOWE GALLERY

INVOICE

DATE: 29. Dec. 2014

SOLD TO: Oona & Sid R. Bass
201 Main St. Ste 3200
Ft. Worth TX 76102 3131

HOME: [redacted]
WORK:
CELL 1:
CELL 2:
FAX: [redacted]
EMAIL 1:
EMAIL 2:
WEB ADDRESS:

SHIP TO: To Above

BA 14048 David Webb
Dolphin Cuff
18kt gold $20,000

SHIPPING & INSURANCE gratis
TAX
TOTAL $20,000

With Thanks.

ALL SALES FINAL. NO REFUNDS. MERCHANDISE CREDIT ONLY.
Second Hand Dealer's License # 088 6070

667 MADISON AVENUE • NEW YORK, NY 10065
TEL: 212-644-6400 FAX: 212-755-6143
WWW.MACKLOWEGALLERY.COM

139. In or around March 2016, Sid sent Oona to see Sid's late mother's jewelry collection where it is stored—an extraordinary gesture given both the considerable monetary value and the sentimental significance of the collection. In fact, only one other person had been afforded the same privilege: Sid's sister-in-law, Ramona Bass.

140. Oona approached the task with care, viewing the pieces multiple times and asking for Sid's opinions before making her selections. She viewed the jewelry not as personal adornment, but as family heirlooms she would one day pass down to Sid's daughters and grandchildren. Oona was initially overwhelmed by the room full of precious and semi-precious jewelry that covered nearly 10 six-foot folding banquet tables, but she felt a responsibility, as a steward of Sid's family legacy, to choose pieces she believed would be meaningful to Sid and to future generations. She also flagged pieces of jewelry of little monetary value but of significant history, such as Sid Richardson's pocket watch, which had a peculiar photo hidden within it.

141. Oona also chose a piece that she thought Sid's daughter Hyatt should have immediately. Sid and Oona reimbursed his mother's estate and gave Hyatt the piece, which Hyatt loved, as Oona knew she would. And, fulfilling a role often reserved for family, Oona chose a necklace to give to Sid's secretary as a retirement gift.

142. When Oona returned home, she realized that some of the most valuable pieces she knew from family photographs, including a necklace with multiple large emeralds and a huge sapphire ring, were missing from the banquet tables. After Oona told Sid that she believed pieces were missing from his mother's jewelry collection, the family directed its security personnel to conduct an internal investigation, which revealed that two members of the Bass security staff had stolen more than $5 million worth of jewelry from Nancy Lee Bass's house after Sid's father Perry Bass died from complications of Parkinson's disease. Years before Oona found they were missing, the pieces had been sold through Sotheby's. Sotheby's had been hired to catalog the collection for

Nancy Lee Bass's estate, but the family had never noticed that these major pieces were not in the inventory. After Oona's discovery, the Bass family approached Sotheby's and inquired specifically about Nancy Lee Bass's favorite unique Harry Winston diamond necklace, valued at $1.2 million, but Sotheby's denied selling the piece and claimed the photograph from their catalogue was not an exact match. In the last years of her life, despite her dementia, Sid's mother had been asking for her diamond waterfall necklace, but nobody went to look for it. The family ultimately chose not to pursue legal action, prioritizing discretion and the Bass reputation over the recovery of their mother's stolen heirlooms.

143. After the investigation, the selection process took on even greater familial importance for Oona. Among the few major pieces Oona wanted was Sid's mother's diamond ring. She knew the ring was meaningful to Sid, and Sid made clear to Oona that he wanted her to have it. But Lee had already laid claim to the ring, and Sid, averse to conflict with his brother, did not press the issue. Sid did bring home several other items from the collection for Oona to wear immediately while the family finalized plans for allocating the larger collection.

144. As for a diamond, Sid wanted Oona to have a diamond of her own and assured her that he would find one for her. Working through the couple's London-based art agent, Sid located a 25-carat stone of exceptional quality in Switzerland, where Oona flew to see it in person. Sid purchased the diamond for her for $2.1 million and had it placed in a custom setting, carefully sized for Oona's left ring finger.

**Fig. 16. Oona's Hand and Van Gogh in Sid and Oona's Bedroom in New York**[36]



145. In 2019, working through their same art agent, Sid purchased a 20-carat emerald in a ring setting for Oona for $1 million.

**Fig. 17. Photograph of Oona's Emerald from Christie's Catalogue**



146. Expensive pieces of jewelry were not the only symbols of Sid's commitment. Others were more subtle, intimate, and deeply personal. For example, Oona has long loved collecting seashells on the beach whenever she travels, including at the Bass family's compound on San José

[36] Fig. 16 shows Oona's hand approximately 12 inches away from the Van Gogh painting under a spotlight.

Island. Sid, knowing how important Oona's seashell collection is to her, gave her a set of antique Boulle cabinets—once owned by a seashell collector in the eighteenth century—in which to store and display her collection.

147. But perhaps the most important symbols of Sid's commitment to Oona were gifts he made not to her, but to others in their lives on her behalf.

148. In late 2019, Sid donated $1 million to the University of Pennsylvania School of Medicine for the school's Chief of Neurology, Dr. Sean Grady, to establish the Otto Sperr Neuro Oncology Faculty Fund in memory of Oona's father. Dr. Grady used the donation to create the Otto Sperr Neuro Oncology Research Fund, which was designed to "provide financial support for research in the area of neuro oncology in the Department of Neurosurgery." Sid directed that, in connection with public announcements by the university or other entities concerning the gift, he should be "referred to as The Family of Otto Sperr."

149. Sid chose to make a donation to Penn's Neurology Department in Oona's father's name because that was where Oona's mother, Portia, underwent lifesaving brain surgery in 2019 under Dr. Grady's care. Portia, now ninety-six years old, lives in Philadelphia and has since exhausted her long-term care insurance. Sid arranged and paid for full-time home health care and security for Portia, allowing her to remain safely in her home and to live as full a life as her age and health permit. The provisions Sid made for Portia took a huge weight off Oona's shoulders; like many adult children, Oona worried greatly about her mother's health and safety. Portia, unsurprisingly, came to think of Sid as family: she loved him for his kindness and generosity. Oona did too.

150. Finally, Sid's lifetime charitable giving reflected their agreement, and Sid's understanding of Oona as his life partner. In 2017, Sid created charitable trusts for each of his daughters. In parallel, and as part of the same estate-planning effort, he established a $10 million

charitable trust—the OOS Charitable Corporation—on Oona's behalf, placing her alongside other members of his family for whom he was making long-term provisions. After a disagreement with his daughter Hyatt, Sid told Oona that he would increase Oona's foundation to $100 million.

151. Around the same time, Sid returned from a meeting with Hyatt and a lawyer, Georgiana Slade, during which Sid, Hyatt, and Ms. Slade discussed the details of a trust for Hyatt's son. Sid raved about Ms. Slade, a prominent New York trusts-and-estates lawyer, and sent Oona her contact information so that, in the future, Oona could seek her counsel regarding the provision he had made and intended to make for her. He said: "You will be needing a lawyer about these things in the future. She is definitely the one you should go to." In or around 2022 or early 2023, Sid spent days planning his will and told Oona that he had revised his will to make sure she would be further provided for after his death. Sid also assured Oona that she would continue to be able to visit San José Island, where she expected their ashes to be scattered.

152. Put simply, Sid repeatedly represented to Oona that she would be provided for throughout her life and that she was the person with whom his life—and his legacy—would remain. And he took concrete steps to fulfill those commitments, on which Oona relied, just as he intended. In May 2023, when Sid and Oona visited Oona's friends, Pete and Annie Champness, in Cornwall before continuing on to London, Annie took Oona aside and asked Oona whether she was safe and financially secure. Oona assured her friend not to worry, explaining that Sid had explicitly told Oona that he had provided for her consistent with their agreement.

153. Indeed, it was only later, after Sid fell under Viafora Kress's influence, that Sid abandoned those promises and ceased performing the obligations he had undertaken for more than a decade. Viafora Kress did not encounter Sid as an unattached man with no obligations to anyone else. She encountered a man living openly with Oona as his partner, with shared homes, staff, finances, routines, and commitments readily apparent to anyone who entered their world. Viafora

Kress learned of those commitments and intentionally set about displacing Oona and inducing Sid to repudiate them.

## IV. AFTER SUFFERING COGNITIVE DECLINE, SID ORDERS OONA TO LEAVE THEIR HOME, THEN PURPORTS TO MARRY THE WOMAN WITH WHOM HE HAD BEEN HAVING AN AFFAIR

### A. After Sid Suffers a Stroke, Sid and Oona Receive Devastating Medical News

154. After an incident in 2019 during which Sid experienced sudden weakness and mental confusion, Sid underwent two days of cognitive testing, including a brain scan, at the University of Pennsylvania under the care of the Chief of Neurology, Dr. Grady—the same physician to whom Sid had donated $1 million just a couple months earlier in memory of Oona's late father.

155. When Oona and Sid met with Dr. Grady in his office to review the results, Dr. Grady pointed to three dark spots on the image of Sid's brain. Dr. Grady explained that each was evidence of a transient ischemic attack (TIA)—a temporary interruption of blood flow to the brain commonly known as a "mini-stroke." The episode Oona had witnessed was apparently Sid's third such event, and, as Dr. Grady explained, having a TIA puts a patient at a significantly higher risk of a major stroke. Dr. Grady then went on to share even worse news: the structure of Sid's brainstem, he said, was consistent, unmistakably, with a "particularly pernicious form of Parkinson's disease."

156. Oona was stunned. She asked Dr. Grady how Sid could possibly have Parkinson's disease given that he did not walk with a shuffle or have a tremor. Dr. Grady explained that Parkinson's is a particularly insidious condition and does not always present initially with motor symptoms. There was no satisfying explanation for why Sid had not yet developed those more visible manifestations of the disease, but Dr. Grady made clear that his assessment was information they both needed to know.

157. Eventually, Oona would come to understand that Parkinson's disease can manifest with non-motor symptoms, including poor judgment, compulsivity, perseveration, forgetfulness, and changes in temperament—all of which were symptoms she would later recognize in Sid.

**B. Gradually, Oona Begins to Notice Changes in Sid's Behavior and Personality**

158. Over time, Oona began to notice changes in Sid's personality that reminded her of the way Sid had described his late father, Perry. In particular, in more recent years following Sid's brain scan, Sid began to become less communicative, even more impulsive, and at times outright cruel in a way that frightened Oona. Sid had told Oona that Perry, despite his extraordinary wealth, became miserly toward the end of his life, keeping obsessive notes calculating matters such as how many times he could brush his teeth from a single tube of toothpaste. Perry suffered from Parkinson's disease, too—a condition Oona now understands often manifests with symptoms of frontal-lobe dementia, sometimes even before the onset of classic motor impairment. To her alarm, Oona began to understand from Sid that he too was keeping similar obsessive and compulsive notes. He also began displaying unusual rigidity—arranging his socks with exacting precision and becoming extremely agitated when a set of midcentury plates was stacked imperfectly.

159. Sid had also told Oona, with embarrassment, that in the years his father's cognitive symptoms worsened—when his father was around the same age Sid is now—Perry had an affair with a woman, and the family had paid a large sum of money to buy the woman's departure and silence. Oona did not expect at the time that Sid had similarly taken up with another woman as his own symptoms progressed.

160. Sid also started acting like his father in other destructive ways: he began drinking heavily. Sid had always enjoyed alcohol—in what Oona would later recall as happier times, he often drank an entire bottle of wine each day. At the time, Sid's tolerance was high, and he never appeared drunk. But during the COVID-19 lockdowns of 2020 and 2021, Sid's intake doubled to

two bottles of wine on most days. Sid, recalling his father's abusive alcoholism, often bragged to Oona that he never touched hard liquor, only wine. But given the quantities he was consuming, his use of prescription sleeping pills, his advancing age, and his declining tolerance, that distinction made little (if any) difference. Oona was heartbroken to realize that Sid was taking increasing risks while under the influence: trading in the stock market after drinking heavily at lunch, driving when he was in no state to drive, and even forgetting to lock their doors at night, which was a marked change for him.

161. As Sid's drinking intensified, so too did his volatility. Alcohol seemed to amplify both petty and long-held grievances, fueling sudden, unpredictable rages against a long list of people he believed had wronged him over the course of his life, from business colleagues and doctors to employees and family members. For years, his resentment had centered on two figures: his father and his first wife, Anne. But over time, his tirades—once sporadic—became increasingly frequent, escalating from semi-weekly outbursts to near-daily episodes of rage. Anne, he would say, was the "worst of the worst," and her memory did not recede with time, even after she died from cancer in 2020. It lingered, animated and immediate, as though the injuries he recounted were freshly inflicted rather than decades old. Compounding Oona's alarm, Sid also began to speak about people who had died in the present tense, as if they were still alive.

162. Sid's financial judgment also appeared to be slipping in more recent years. Shortly after Sid established the OOS Charitable Corporation, Oona was surprised to see that the trust had lost a lot of money. She learned that Sid had been personally managing the trust's assets, and that his decisions had cost the trust millions of dollars. After Oona asked what had happened, Sid wrote her a personal check to cover the losses. Sid also bragged to Oona about making $200 million in 2022 or 2023, only to sheepishly admit to her a few months later that he had lost all of it in the stock market.

163. Oona was not the first person close to Sid to recognize the risk that he might lose his fortune if left entirely to his own devices. A few years earlier, Sid's longtime CEO, Bill Ryman, had taken steps to protect Sid from his impulsive investment decisions by secretly setting aside a substantial portion of Sid's assets as an available disaster fund. After Ryman's sudden death in 2018, Sid discovered what Ryman had done and was enraged. When Oona later mentioned Ryman's name, Sid became ballistic. Oona, for her part, saw that Ryman's actions, though clearly out of line, had been taken with Sid's best interests at heart.

164. Even after COVID restrictions ended, Sid became increasingly withdrawn. He showed little interest in excursions and had all but stopped painting. Oona was concerned that Sid might be depressed after several of his friends died, including his dearest friend Gustavo Cisneros at the end of 2023. Oona was mourning Gustavo too and very sympathetic. She suggested local trips together in Colorado, but Sid spent most of his time sleeping.

165. Sid also began to speak without any apparent inhibition, often in ways that were hurtful or disturbing. He made casual (and extremely graphic) references to prostitutes in Italy. Sid had always been a proud and private man, and Oona was disturbed by his fixation on old grievances and his sudden openness about sleeping with prostitutes and experiencing memory problems. She began to wonder whether Sid's apathy, compulsions, poor judgment, and diminished empathy were signs that Sid's Parkinson's disease had progressed beyond the abnormalities first identified on his brain scan several years earlier.

166. To cope with her concern, Oona doubled down on her efforts to get Sid to take better care of himself, doing everything she could to slow the progression of his decline. She tried on occasion to get him to drink less, but more often than not was hesitant to do so, as it would send him into a rage. She threw herself into building an organic greenhouse on their Colorado property so that they could grow antioxidant-rich vegetables. She also encouraged Sid to reduce his stress,

suggesting in either 2022 or 2023 that he hire a personal CFO to take on some of the workload Sid had assumed after Ryman died in 2018, which only threw Sid into a fit of rage—he hated the thought of giving up control.

### C. Sid Abruptly Ends His Relationship with Oona and Orders Her to Leave Their Colorado Home

167. Despite the mounting signs of Sid's cognitive decline, nothing in Sid's conduct toward Oona suggested that he intended to abandon the commitments and partnership they had shared for the previous decade.

168. With the benefit of hindsight, however, there were signs. In the summer of 2024, Oona began attending meetings with the ranch manager in Pagosa Springs, whom she had known for a decade. Sid had usually seen him on his own. Oona's goal was to prepare to be a good steward to the large and ecologically improving property, so she set out to learn about how it was managed. Oona assumed the ranch would be passed on to Sid's family after she died. With Sid's blessing, Oona suggested they needed an updated map that reflected additional properties acquired and showed more detail. Later, Sid would cruelly mischaracterize her involvement.[37]

169. On the morning of September 3, 2024, Oona sensed that something was wrong. She returned to the breakfast table overlooking the porch at their Pagosa Springs residence and asked Sid if he was okay. He replied flatly: "I want a separation. You are to pack and leave."

170. Oona sat down, frozen and numb as Sid proceeded to outline what he had clearly prepared in advance. He told her he would give her $50 million as a separation payment. He also said Oona would continue to have security, access to the accountants and secretary, and payment

[37] While Oona packed in September after Sid said he wanted to end their relationship, Sid accused Oona of "imposing herself" on the meetings. Oona was shocked at his misunderstanding of her motivation. In hindsight, his reaction coincided with his secret relationship with Viafora Kress and her growing influence over him, which would ultimately cause Sid to reverse his prior promises to Oona regarding the ranch.

for Portia's care "in exactly the same way." He directed Oona to return to New York, complete the renovations at East 71st Street, and move into that house, assuring her that it would be hers.

171. Still in shock, Oona pleaded with Sid to go to couples counseling. But Sid dismissed the suggestion, saying that he was far too old for counseling.

172. The following morning, Sid added that he wanted to purchase a second home for Oona in Manhattan, "in a quiet place." Oona suggested that a second home outside of New York made more sense. Sid agreed and said that he would talk to Tom White to "figure out how to make this happen." He also told her to call Fred Williams at Sotheby's Realty to start a search.

173. In the days that followed, Oona was struck by how cold and composed Sid had been. It became clear that he had rehearsed the conversation—much as he had decades earlier when he calmly informed Anne from a Paris hotel suite shared with Mercedes that he wanted a divorce.

174. In fact, infidelity was one of the first things that came to Oona's mind. She asked Sid if there was someone else, but he vehemently denied it. Oona spent the next several weeks in Colorado, packing her bags, planning her next steps, and trying to comprehend Sid's sudden upending of the life they had built together over the last decade. Compounding her confusion, as Oona packed, Sid told her more than once that he still loved her, and they continued to cook together, eat together, take long walks on the ranch, and sleep in the same bed until Sid took her to the airport on September 30.

175. On September 22, 2024, Oona intended to pack her study, which was located in the basement beneath Sid's studio. As she opened the front door, she heard Sid speaking very loudly on his headphones and saw him pacing in the studio, which spans two large, open central rooms of the house. Sid was animated and completely engrossed, unaware of Oona standing there. To Oona's astonishment, he was calling the person to whom he was speaking "sweetheart" and repeatedly saying, "You're my gal!" Oona was further shocked when she heard Sid discuss the

unidentified woman's move into Sid and Oona's home in Colorado a mere eight days after Oona's departure. It was clear from Sid's side of the conversation that the woman was micromanaging everything and making multiple demands—for example, she was insisting that Sid was not allowed to drive Oona to the airport and that not one possession of Oona's could be anywhere on the property when the woman moved in. The woman was even imposing absurd ideas on Sid about how the ranch needed to do things. This was not a new relationship. True to form, Oona heard Sid tell the other woman the same thing he had once told Oona: to keep her New York apartment because, "You never know when you'll need to be back for a day or two." As the call ended, Sid remarked on how hard this would be for Oona, unaware that she was within earshot. There was an unmistakable satisfaction in his voice.

176. A few hours later, Oona asked Sid about the conversation she had overheard and learned that the other woman was Althea Viafora Kress, a woman who has spent her adult life seeking proximity to well-connected, rich men with famous families, and who describes herself in recently updated online profiles as an "Artist's Studio Advisor." The specificity of Viafora Kress's demands revealed the extent to which she had already familiarized herself with Oona's place in Sid's life and was actively directing Sid's separation from her. She was not simply asking when she could move in. She was instructing Sid how he was permitted to communicate with Oona, whether he could drive Oona to the airport, what was to happen to Oona's possessions, and how the household Oona had managed for a decade would operate once Viafora Kress took her place.

177. Sid, for his part, has never admitted the affair to Oona.

### D. Sid Repudiates His Commitments to Oona, Displaces Her from Their Life Together, and Replaces Her

178. Oona was shattered by the sudden end of her relationship with Sid. She had devoted more than a decade to the life they built together and reasonably expected to remain by Sid's side until one of them died, consistent with the commitments they had made to one another. Learning

that Sid had been planning a different life with another woman in Oona and Sid's homes, while Oona had continued to devote her life to Sid, was devastating. Sid's health situation only compounded Oona's distress and concern. Most painful of all, however, was discovering that Sid had informed security personnel, executives, lawyers, and others of his decision to end their partnership before telling Oona herself. Oona lost more than twenty pounds in a matter of weeks.

179. After Oona overheard the telephone call, the charming and lovable partner she once knew was gone. In his place stood someone cold, transactional, blank, and seemingly indifferent to the devastation his decisions had inflicted. In the months that followed, Sid's conduct reflected a dismantling of the life they had built together. Three emails sent after Oona left Colorado and returned to live in the couple's homes in New York full time progressively withdrew the commitments Sid had made during their partnership and even those he had made on September 3 and 4.

180. First, on January 18, 2025, Sid informed Oona that, at his direction, Sid's security personnel had packed up Oona's possessions from their home in Fort Worth and moved them into a storage facility. For over a decade, Oona had accumulated personal effects, including cherished family heirlooms, in Texas—items that were part of their shared home and future. Among the items Sid ordered his staff to pack were Oona's most personal belongings, including her clothing, books, important documents, and heirlooms. Oona had never been informed of or consented to this—in fact, while packing in Colorado in September 2024, she had asked Sid to be permitted to fly to Texas and pack her things, but he said there was no rush and "that can happen later." Months after Oona left Colorado, Sid also had "some of her possessions" in Pagosa Springs packed and driven by his employees across state lines, to a storage facility in Texas—again, without her consent or knowledge. Oona still does not know which of her possessions were and were not moved from Pagosa Springs into storage in Texas. Oona had family heirlooms in Pagosa Springs as well.

181. Sid's perfunctory email announcing this latest betrayal in Texas was brisk and businesslike. Oona was shocked and felt deeply violated that Sid had directed male security employees—men she had managed for years—to pack her intimate belongings without her knowledge or consent. Oona wrote to Sid that she couldn't square his latest callous act with the "good man of solid judgment that I've known," and knew that the order to pack and move her things must have originated with someone else. Oona has since learned that she was right: Viafora Kress directed the removal of Oona's possessions from the homes Oona had shared with Sid.

182. Later that day, Sid sent Oona a proposed "Maintenance Agreement." It surprised Oona that Sid had taken so long to transmit the proposed agreement; when Sid had seen her off at the airport in Colorado on September 30, he had assured her that his attorneys at Kelly Hart & Hallman would forward the necessary paperwork within days. Instead, months passed without progress.

183. When Oona reviewed the Maintenance Agreement, it bore little resemblance to the assurances Sid had made to her in person on September 3 and 4, 2024, much less the more significant property interests and financial support that were part of the couple's longstanding agreement regarding their respective roles and obligations to each other.

184. By then, Viafora Kress had spent months further consolidating her influence over Sid and, upon information and belief, intentionally persuading and inducing him to disavow his obligations to Oona. The proposed agreement did not merely retreat from the more limited commitments Sid made on September 3 and 4; it also substantially repudiated the broader obligations he had undertaken throughout the couple's decade-long partnership. That stunning reversal came only after Viafora Kress entered the picture, demanded that Oona be removed from her own homes and life, and began exercising progressively greater control over Sid's affairs.

a. Instead of providing the promised $50 million payment—which, although materially less than the property interests and lifelong financial provision Sid had promised Oona throughout their relationship, would at least have allowed her to sever ties immediately and rebuild an independent life—the agreement proposed annual "maintenance" payments extending through January 2035, when Sid would be nearly 93 years old, thereby ensuring Oona's continued financial dependence on Sid (who is likely to become even more mentally incapacitated as his cognitive symptoms progress) or, even worse, that Oona will be at the mercy of Viafora Kress—who purports to be Sid's new wife—or unknown trustees or heirs once Sid passes or is otherwise no longer able to manage his affairs.

b. Rather than honoring Sid's longstanding promise that Oona would share in the ownership of the homes they acquired together—or even transferring ownership of the East 71st Street residence, as Sid had promised on September 3—the proposed agreement offered Oona only a "lifetime residence lease," reducing her from an owner to a tenant in the guesthouse directly behind the East 70th Street home that she and Sid had jointly purchased and renovated and which, presumably, would be occupied by Sid and Viafora Kress. At the same time, the agreement required Oona to pay all "costs and expenses related to ownership" of the property, including "repair and maintenance expenditures, utilities, ad valorem taxes, property insurance, and other such items."

c. The agreement omitted any reference to the second property outside of Manhattan Sid had promised to purchase for Oona on September 4, while likewise abandoning his broader agreement that Oona would share in the ownership and enjoyment of the four homes they had acquired and/or renovated together during their decade-long partnership.

d. The agreement likewise abandoned Sid's September 3 promise that Oona would continue to receive security and support from Sid's secretary and accountants, despite the central role those employees had long played in managing the parties' intertwined financial and household affairs.

e. Finally, the agreement abandoned Sid's longstanding commitment—and his express September 3 promise—to continue caring for Portia, committing only to security costs while requiring Oona to bear all remaining expenses associated with her mother's care and home.

185. The Maintenance Agreement also required Oona to comply with sweeping, one-sided non-disclosure requirements. In all her years with him, Sid had never mentioned a non-disclosure agreement or expressed concerns about the matters he had confided in Oona.

186. Oona could not accept terms that materially reduced not only the commitments Sid made on September 3 and 4, but also the far broader property interests and financial support Sid had promised throughout their decade-long partnership. More than a decade earlier, she had given up her career and devoted her life to Sid, in reliance on their agreement and Sid's promises that he would share with her the ownership and enjoyment of the property they acquired together and provide her with lifelong financial support commensurate with the extraordinary lifestyle they shared. Sid repeatedly reaffirmed those commitments, including his promise to continue caring for Portia and his assurances that Oona had no need to obtain life insurance, accidental death and dismemberment coverage, or a pension, because he would provide for both Oona and her mother. Given Sid's advanced age, his history of strokes, his probable Parkinson's and cognitive decline, and his increasing volatility, Oona reasonably feared that long-term installment payments over a period of ten years placed her financial security at grave risk.

187. When Oona questioned why Sid had retreated even from the commitments he made on September 3 and 4, Sid claimed that he could not afford a $50 million lump-sum payment because of "cash flow issues." Oona found that explanation impossible to credit. Throughout their relationship, Sid had repeatedly represented that his wealth substantially exceeded publicly reported estimates and assured Oona that providing for her would never present a financial burden. Days after Viafora Kress moved into the Pagosa Springs residence, Sid and Viafora Kress flew to New York to purchase an apartment in one of Manhattan's most exclusive buildings for $14 million, before eventually settling on a two-story penthouse worth more than double that figure. Multiple persons have reported that Viafora Kress took him on a big trip to Europe, including Paris, where he was seen and is rumored to have spent millions of dollars and, on information and belief, has spent more since Viafora Kress entered his life than he spent during his entire decade-plus relationship with Oona. The contrast is extraordinary: the same man who claimed to lack the "cash flow" to honor his obligations to Oona suddenly had millions available to finance Viafora Kress's extravagance. Embarrassingly, even Sid himself would later contradict his "cash flow" excuse, and instead cite gift tax concerns as the hurdle, rather than acknowledge Viafora Kress's extravagant spending and his own billions in assets.

188. On July 16, 2025, Oona wrote to Sid from New York directly to memorialize the specific terms he had offered her on September 3 and 4, 2024, and to plead with him to honor even those commitments, which were a fraction of what he had promised her over their decade together. She recounted Sid's September 3 and 4 offer term by term: a $50 million lump sum, the East 71st residence, continued care for Portia, continued help from Sid's secretary and accountants, and a second, quieter home outside New York City. Oona reminded Sid that they had always had a relationship built on his word—and that their friends saw him as "a person with whom one could make a verbal agreement." Sid never disputed anything in Oona's email.

189. Instead, on August 22, 2025, an email from Sid's account with the subject line "News" purported to inform Oona that Sid had married Viafora Kress on August 9, 2025, in a ceremony at the Bass family compound on San José Island, Texas. The email announced that "Althea will change her name to Viafora-Bass" and purported to describe the persons who had attended the event. Oona has since learned that the email was itself another manifestation of Viafora Kress's deceit and control. Upon information and belief, Sid neither drafted nor sent it; Viafora Kress used Sid's account to announce her own purported marriage to him.

**Fig. 18. August 22, 2025 Email from Sid to Oona**

**From:** Sid Bass <[redacted].net>
**Date:** August 22, 2025 at 5:51:12 PM EDT
**To:** Oona Sperr <[redacted].com>
**Subject: News**

Althea and I were married on Saturday, August 9th at San Jose Island. Hyatt, Samantha and grandsons, plus Lee and Ramona attended. Althea's seven closest friends attended.

J[redacted], S[redacted] and H[redacted] were my Best Men. Lee assisted the Officiate, Wade.

Althea will change her name to Viafora-Bass.

190. The circumstances of the ceremony were consistent with what was happening throughout Sid's life: his world was being shrunk while persons connected to and/or dependent upon Viafora Kress were being brought in.

191. Regardless of its true author, the last message was nonetheless an emotionally cruel blow. In every respect, Oona was recognized and treated by Sid, his employees, associates, and the world as his lifelong partner, and everyone understood their relationship to be exactly that.

192. The coerced ceremony appears to have emboldened Viafora Kress to behave as though the entirety of Sid's life were hers to control. Based on numerous accounts from individuals with first-hand knowledge, Viafora Kress has since cut Sid off from many in his life. Persons now

report difficulty reaching Sid directly and his sudden failure to pay certain of his bills, and communications ostensibly from Sid are increasingly controlled and/or authored by Viafora Kress. Most surprisingly of all, Sid began telling friends—but also mere acquaintances—that he is losing his memory.

193. Viafora Kress has implemented a similar purge within Sid's (and Oona's) household. She will not work with anyone who worked with Mercedes or Oona and has fired, excluded, or caused the departure of employees who served Sid for years before Viafora Kress appeared. Her focus on Oona and Mercedes is revealing insofar as it shows Viafora Kress's attempt to place herself alongside Oona and Mercedes—the two women in Sid's life who preceded Viafora Kress's purported marriage. Mercedes, for her part, met with Sid and Viafora Kress at one point after the sham marriage ceremony and afterwards told people that Sid looked the loneliest she had ever seen him and that something was "off."

194. Viafora Kress has replaced at least some of those employees with persons whose principal loyalty is to her rather than to Sid, including, upon information and belief, a former doorman from the East 72nd Street building in which Viafora Kress previously lived. The result is a household increasingly staffed by people selected by Viafora Kress, communicating through channels controlled by Viafora Kress, surrounding an elderly man already suffering from serious neurological and cognitive symptoms.

195. At the same time, Viafora Kress has exercised ever greater influence over Sid's spending and his (and Oona's) property. She whisked Sid away to Europe and caused or encouraged millions of dollars to be spent, expenditures sufficiently extraordinary that they became a subject of discussion among those who observed them. The same man who loved his previous homes and supposedly lacked sufficient "cash flow" to honor his decades-old commitments to Oona was, under Viafora Kress's influence, suddenly spending extraordinary sums for Viafora Kress's benefit.

196. This progression—from seeking investment "advice," to having an affair, to directing Oona's removal, to moving into Oona and Sid's homes, to controlling Sid's communications, to purging his longtime staff and isolating him from others in his life (his longtime friends and employees' access to him in Fort Worth has decreased), and finally to exercising increasing influence over his extraordinary fortune—was not accidental. It reflects a deliberate campaign by Viafora Kress first to replace Oona as Sid's partner and then, increasingly, to replace Sid himself as the person exercising practical control over his communications, his households, his staff, his property, and ultimately, his life.

197. The pattern is tragically familiar within the Bass family. Sid and Oona had watched Sid's brother Ed become estranged from his family after marrying Sazcha Camacho, who before and thereafter assumed a dominant role in Ed's personal and business affairs, including the management of the family's extensive Sundance Square holdings in Fort Worth. Sid was sufficiently alarmed by what was happening to Ed that he investigated Sazcha and the circumstances surrounding her increasing influence over his brother, and he repeatedly expressed to Oona his anger and distress over Ed's resulting estrangement from the family and the degree to which Sazcha had come to dominate Ed's personal and business affairs. Sid thus understood firsthand the danger of watching a new spouse isolate an aging family member from longstanding relationships while assuming ever greater control over his life and property. Viafora Kress's progressive isolation of Sid from people—and her control over his communications, household, staff, spending, and property—bears a striking resemblance to the very fate Sid once lamented had befallen his brother. In Fort Worth, both inside and outside the Bass organization, people are talking about the tragic parallel.

198. Since September 2024, Sid has told some friends and acquaintances that the end of his relationship with Oona was mutual and consensual. Sid has told others that Oona left him.

Neither statement is true. Oona neither wanted nor expected their relationship to end, nor did she ever agree to terminate the commitments that she and Sid had made to one another.

199. For now, Oona continues to reside in the couple's former home on East 70th Street. Although Sid has sought to displace her from the life they built together, he continues to benefit from her keeping an eye on the renovations and the unique knowledge she accumulated over years of designing, furnishing, and managing the couple's homes. Despite the manner in which Sid has treated her, Oona continues to oversee the punch list and final details of the East 71st Street residence. Upon information and belief, Oona's possessions from both Texas and Colorado remain in a storage facility in Texas, for which she has never received an inventory and where she is unable to access them.

200. What Sid left behind was not a casual relationship, but an intertwined life and decade-long partnership. Oona created homes with Sid across three states, cared for his health, managed his properties, sacrificed her career, and relied upon the promises he made to her. Sid accepted, encouraged, and repeatedly reaffirmed the arrangement under which Oona devoted herself to their shared life, relied upon her performance, and benefited enormously from it—until he replaced her, abruptly repudiated his commitments to her, and displaced her from the life they had built together. The lived reality of Sid and Oona's relationship is documented in every aspect of the life they shared. What remains to be adjudicated are the legal consequences of Sid's repudiation of that life and of Viafora Kress's deliberate interference with it—including her efforts to obtain or control property in which Oona has contractual or equitable rights. Neither Sid nor Viafora Kress can extinguish those rights simply by transferring, gifting, retitling, or otherwise placing property in Viafora Kress's hands.

## V. SID AND OONA ENTERED AN ORAL AGREEMENT UNDER NEW YORK LAW, PURSUANT TO WHICH SID PROMISED OONA SIGNIFICANT PROPERTY AND FINANCIAL SUPPORT

201. Oona is entitled to the substantial property interests and financial provision that Sid repeatedly promised her in exchange for devoting her life to him, their households, and their shared life. Sid's clear and unambiguous promises to Oona—all of which he intended and expected to induce Oona's reliance—are enforceable as a matter of New York contract law and equity.

202. When Oona agreed to Sid's request at his Manhattan townhouse in early 2014 that she "never leave," Sid made the terms of their agreement unmistakable: in exchange for Oona's commitment to devote herself to their shared life as Sid's partner—including organizing and managing their households, caring for Sid, and accompanying him wherever he chose or needed to be—Sid agreed that Oona would never again need to support herself financially, that he would generously provide for her, and that she would share in the property and assets they acquired during their relationship. Almost immediately, Oona performed her obligations under that agreement. She gave up her career and dedicated herself full-time to organizing and managing their households and traveling wherever Sid chose or needed to be, all in reliance on Sid's promises.

203. Over the next decade, the couple's life together confirmed Sid's commitments under their agreement. Sid repeatedly identified the specific properties Oona would receive under the parties' agreement: both New York townhouses, which they had purchased and customized together; their home in Fort Worth, which they had expanded together; and the Pagosa Springs ranch and residences, which had become their primary home at points during the pandemic—together with sufficient financial support to maintain those properties, preserve the parties' established lifestyle, and continue providing for Portia throughout her life. His repeated statements and acts made in New York, Colorado, and elsewhere confirmed what Sid had promised from the

outset: that Oona would receive substantial real estate, the financial means to maintain that real estate, and sufficient financial support to preserve her established lifestyle.

204. Under the circumstances of their relationship and partnership, Oona's reliance on Sid's promises was both reasonable and entirely foreseeable. Until Sid's abrupt announcement on September 3, 2024, he took repeated, concrete steps to bind their lives together: he intertwined their finances, established a charitable trust in Oona's name at the same time he established similar trusts for his daughters, insisted that they execute reciprocal powers of attorney, and gave Oona the same objects of devotion he had given his previous wives. Just as importantly, Sid repeatedly assured Oona that she would never again need to support herself or Portia financially. He told Oona she did not need life insurance to provide for Portia if Oona predeceased her, accidental death and dismemberment insurance to protect herself and Portia in the event Oona suffered a catastrophic injury, or the company pension, because he would provide for them both. He further informed Oona that he had revised his estate plan to provide for her. Taken together, Sid's words and conduct demonstrate that Oona's reliance on his express promises was both reasonable and foreseeable. Indeed, the terms Sid himself proposed on September 3 and 4, 2024, confirm that he recognized Oona's decade of reliance and understood that the dissolution of their relationship required him to address the obligations he had long undertaken, even though the proposal itself did not fully reflect the scope of his promises and obligations.

205. Oona relied on Sid's promises to her detriment and suffered an unconscionable injury. In reliance on Sid's promises, Oona abandoned her independent career and devoted more than a decade to performing the obligations the parties contemplated: managing and maintaining their homes, caring for Sid, accompanying him wherever he chose or needed to be, overseeing their households, and assuming the daily responsibilities that enabled the life they shared. Having fully performed her obligations under the parties' agreement, Oona has suffered not only the injury

resulting from Sid's repudiation of his promises, but also substantial consequential damages, including lost income and earning capacity, lost retirement savings and financial independence, the inability to plan independently for her own and Portia's future, diminished future employability, and the significant costs of rebuilding the independent life she relinquished in reliance on Sid's promises.

## VI. COLORADO LAW, LIKE NEW YORK LAW, ENFORCES SID'S PROMISES OF PROPERTY AND FINANCIAL SUPPORT

206. Sid's promises to Oona are equally enforceable, as a matter of law or in equity, under Colorado law, where the couple made their primary home for much of their relationship and where Sid repeatedly reaffirmed his commitments to Oona.

207. When Oona agreed to devote herself to Sid and their shared life, Sid promised in return that she would share in the property they acquired together and receive financial support sufficient to maintain their established lifestyle for the remainder of her life. Oona's consideration consisted of years of domestic management, caregiving, design and renovation work, and the abandonment of her independent career. As Sid and Oona performed their oral agreement over the following decade, Colorado became the center of the life they built together. Beginning in or around 2020 or 2021, during the pandemic, and in some of the years that followed, Sid and Oona made their Pagosa Springs ranch their primary home—where they spent more than half of each year and where Oona managed the ranch and residences, oversaw their design and improvement, and cared for Sid as his health declined.

208. Even apart from the parties' express agreement, equity independently entitles Oona to relief for the benefits Sid retained at her expense. Under Colorado law, a defendant is unjustly enriched where he receives a benefit, at the plaintiff's expense, under circumstances that make it unjust for the defendant to retain the benefit without compensation. That a benefit is conferred in a close, confidential relationship is no bar to recovery.

209. Sid and Oona mutually intended that Oona would share in the ownership of the homes they acquired, designed, and improved together, and that she would be provided for out of the property and wealth their shared life produced. For more than a decade, Sid and Oona demonstrated this mutual intent: Sid accepted and retained the benefit of Oona's labor, skill, and sacrifice in acquiring, improving, and maintaining the parties' Colorado home and their other properties, while repeatedly assuring Oona that she would share in them. Oona, in return, relied on Sid's promises to her substantial detriment, abandoning her career and devoting her time and labor to their shared life in reliance on his assurances that she would be provided for. Sid's repudiation of their shared purpose, and his retention of the full value of the property Oona helped create, was a significant deviation from the parties' mutual purpose that unjustly enriched him under Colorado law.

210. Whether analyzed as a breach of the parties' agreement or as a claim in equity, Colorado law—like New York law—affords Oona a remedy for the property and support Sid promised and then refused to provide.

## VII. VIAFORA KRESS INTENTIONALLY INTERFERED WITH SID'S OBLIGATIONS TO OONA AND HAS SOUGHT TO APPROPRIATE THE LIFE AND PROPERTY THEY BUILT TOGETHER

211. Viafora Kress entered Sid's life knowing that Oona and Sid had been living together for nearly a decade and shared multiple homes, staff, finances, travel, and responsibilities to each other, and that Sid had undertaken concrete obligations to provide Oona with lifelong financial security and substantial interests in the property they had acquired and improved together.

212. Viafora Kress nevertheless deliberately interfered with that relationship and those obligations. She first approached Sid under the guise of seeking investment advice, which led to a lunch with Sid and Oona at Tacombi on the Upper East Side in December 2022. At that meeting, Viafora Kress observed firsthand the nature of Sid and Oona's longstanding partnership and learned

facts concerning Oona's established place in Sid's personal and financial life and his obligations to her. As Sid's cognition and judgment declined, Viafora Kress cultivated an increasingly intimate and controlling relationship with Sid whenever he and Oona visited New York, and ultimately began giving Sid specific instructions designed to sever Oona from him and from their shared life.

213. By September 2024, Viafora Kress was directing that Sid cease speaking directly with Oona, directing that Sid not drive Oona to the airport, demanding that every trace of Oona's possessions be removed before Viafora Kress moved into the Colorado home, and otherwise dictating the mechanics by which Oona would be expelled from the life she had built with Sid. In the months that followed, Viafora Kress continued consolidating her influence while Sid increasingly retreated from the financial and property obligations he owed Oona.

214. Viafora Kress's conduct did not stop once Sid breached his obligations. Upon information and belief, she has since taken substantial control over Sid's communications, isolated him from others, caused trusted staff to be fired and replaced by persons loyal to her, and exercised increasing influence over Sid's spending and property. She has even used Sid's own electronic communications to speak in his name.

215. To the extent Sid and/or Viafora Kress have transferred, gifted, retitled, purchased, or otherwise placed assets in Viafora Kress's name or for her benefit, Oona is entitled to those assets and to recover or impose a constructive trust upon any property reflecting Oona's contractual or equitable interests. The precise nature and extent of the assets transferred to or acquired by Viafora Kress are presently within Defendants' exclusive knowledge and will be established through discovery.

## CAUSES OF ACTION

### COUNT I

### Breach of Express Oral Agreement Under New York Law

(against Defendant Sid Bass)

216. Plaintiff repeats and incorporates all preceding paragraphs and realleges them as if set forth fully herein.

217. In or about January 2014, in New York, New York, Sid and Oona entered into an express oral agreement under which Oona agreed to abandon her independent career and devote herself to providing services to Sid that included: maintaining and managing their households in New York and elsewhere; overseeing the acquisition, design, renovation, furnishing, and maintenance of their homes in New York and elsewhere; caring for Sid's personal, medical, and domestic needs; and accompanying and assisting him in his personal, charitable, and family obligations. In exchange, Sid expressly promised that Oona would share in substantial real property acquired during their relationship, would receive sufficient financial support to maintain those properties and the lifestyle they established together for the remainder of her life, and that he would provide lifelong financial security for Oona's mother, Portia.

218. The parties mutually assented to these obligations, and the essential terms of their agreement were sufficiently definite to be enforced. Over the course of the next decade, Sid repeatedly confirmed, clarified, and implemented the parties' agreement through both his words and his conduct. Among other things, Sid involved Oona in the acquisition and expansion of homes intended for their shared use; expected and encouraged her to devote her professional design skills to extensive and permanent renovations tailored to their joint and future needs; repeatedly identified the specific properties Oona would receive; and instructed Oona to forgo separate insurance and pension protections because he had already provided, and would continue to provide, for both Oona and Portia. Sid's repeated statements and conduct gave concrete meaning to the parties' original

agreement and consistently reaffirmed the same bargain he had made with Oona at the outset of their relationship. His obligations under the parties' agreement were not contingent upon, or deferred until, his death. He was obligated to share the promised property interests and provide the promised support during the parties' lives—as Sid himself recognized (in part) on September 3 and 4, 2024, when he proposed an immediate $50 million payment, the conveyance of the East 71st Street residence, the purchase of an additional home for Oona, and other ongoing support for Oona and her mother Portia.

219. In reliance upon the parties' agreement and Sid's repeated assurances, Oona fully performed the obligations she had undertaken. Her performance went far beyond the ordinary incidents of a romantic relationship or shared domestic life. At Sid's request, Oona gave up her independent career and economic opportunities and, for more than a decade, assumed primary responsibility for acquiring, expanding, designing, permanently renovating, furnishing, improving, and maintaining the very homes in which Sid had promised she would share ownership and that he later specifically told her she would receive. Those acts of performance were unequivocally referable to the parties' agreement. She structured those homes for their permanent shared use and for their anticipated needs as they aged together; managed the parties' households and staff in New York and elsewhere; cared for Sid during serious illnesses and medical procedures; accompanied him to medical appointments; supported his charitable, family, and social commitments; traveled with him wherever he chose or needed to be; and organized her financial and personal life around the financial security Sid had promised her. Oona undertook those extraordinary and long-term commitments because Sid asked her to do so as her part of the bargain they had made, while repeatedly assuring her that he would perform his corresponding obligations of property ownership and financial support.

220. Oona substantially and fully performed every material obligation required of her under the parties' agreement. Sid knowingly accepted, encouraged, and benefited from Oona's performance throughout their relationship while repeatedly reaffirming his own obligations under the agreement. Sid never treated Oona's work on the parties' properties as gratuitous or merely incidental to their relationship; to the contrary, while accepting the benefit of that work, he repeatedly assured Oona that she would share in the ownership of the homes they were acquiring, expanding, and improving together.

221. After receiving the benefit of Oona's complete performance for more than a decade, Sid materially breached the parties' agreement by repudiating his obligations to Oona. Among other things, Sid refused to convey the promised interests in the parties' real property, refused to provide the promised financial support sufficient to maintain the lifestyle the parties had established together, sought to substitute materially lesser benefits than those he had promised throughout the relationship, withdrew his commitment to provide for Portia as promised, displaced Oona from nearly all of the homes they had acquired together, and otherwise failed and refused to perform his obligations under the parties' agreement. Sid communicated his repudiation to Oona in Colorado and in written communications directed to Oona in New York, including the January 18, 2025 transmittals and the proposed "Maintenance Agreement."

222. As a direct and proximate result of Sid's material breach of the parties' agreement, Oona is entitled to damages in an amount to be proven at trial, but not less than $400 million, and to such equitable relief as may be necessary and appropriate to enforce Sid's obligations with respect to the property interests he promised her.

**COUNT II**

**Promissory Estoppel Under New York Law**

(against Defendant Sid Bass)

223. Plaintiff repeats and incorporates all preceding paragraphs and realleges them as if set forth fully herein.

224. Sid made repeated, clear, and unambiguous promises to Oona in New York that she would be financially secure for the remainder of her life if she undertook the responsibilities described above and devoted herself to their shared life together. Those promises included that Oona would receive substantial interests in multiple real estate properties, sufficient financial resources to maintain the properties and the lifestyle they established together, and lifelong financial security for her mother, Portia.

225. Sid's promises were not vague expressions of affection or aspirational statements about the future. Rather, throughout the parties' relationship, Sid repeatedly identified the specific benefits Oona would receive, including the homes she would own and the financial resources necessary to maintain those homes and their established lifestyle (including the help of specific longtime employees). Sid's repeated words and conduct gave concrete meaning to the promises he had made from the outset of the relationship.

226. Sid reasonably and foreseeably expected Oona to rely upon those promises. Indeed, Sid repeatedly encouraged that reliance by assuring Oona that she did not need to maintain separate life insurance or other financial protections because he had already arranged for her financial security and Portia's care.

227. Oona reasonably relied upon Sid's promises to her substantial detriment. In reliance upon those promises, she abandoned her independent career, forwent professional advancement and retirement savings, devoted more than a decade to maintaining the parties' homes and shared life, cared for Sid during serious illnesses and medical procedures, and organized her entire financial

and personal future around Sid's repeated assurances that she would be permanently provided for in a manner consistent with their established lifestyle.

228. Oona's reliance resulted in injuries extending well beyond the loss of the promised benefits themselves, including lost income and earning capacity, foregone retirement savings, diminished future employability, the costs of reestablishing her financial independence after more than a decade outside the workforce, and other substantial economic losses.

229. Sid accepted and benefited in New York and elsewhere from Oona's reliance for more than a decade while repeatedly reaffirming the promises upon which that reliance was based. To permit Sid now to repudiate those promises after inducing Oona to fundamentally restructure her life in reliance upon them would result in an unconscionable and manifest injustice.

230. Equity requires enforcement of Sid's promises, and Oona is entitled to recover damages in an amount to be proven at trial, but not less than $400 million.

**COUNT III**

**Imposition of a Constructive Trust Under New York Law**

(against Defendant Sid Bass)

231. Plaintiff repeats and incorporates all preceding paragraphs and realleges them as if set forth fully herein.

232. For more than a decade, Sid and Oona lived together in a confidential and fiduciary relationship characterized by mutual trust, confidence, and dependence. They jointly planned and managed their financial affairs, made significant decisions concerning the acquisition, expansion, renovation, and use of their homes, and entrusted one another with authority over deeply personal, financial, and medical matters. Sid and Oona also executed reciprocal powers of attorney in New York, Colorado, and Texas—legal authority that Sid continues to hold over Oona to this day.

233. In the course of that confidential relationship, Sid repeatedly promised, expressly, that Oona would acquire ownership interests in the real property they built and shared together,

including the East 70th Street residence, the East 71st Street residence, the Montgomery Plaza apartment in Fort Worth, and the Pagosa Springs ranch and houses, and repeatedly stated that she would have sufficient financial resources to maintain those properties throughout her lifetime.

234. In reasonable reliance upon Sid's promises and the parties' confidential relationship, Oona devoted substantial time, labor, skill, creativity, and financial sacrifice to acquiring, expanding, designing, renovating, furnishing, improving, and maintaining the parties' homes. She made those contributions with the understanding—repeatedly confirmed by Sid—that the properties were being acquired, improved, and customized as their shared homes and that she would have ownership interests in them. Those contributions were not merely incidental to Oona's residence in the properties, but were unequivocally referable to Sid's promises concerning her ownership of them: they were undertaken at Sid's request, involved extensive and permanent improvements to homes he had promised Oona she would share in and receive, and followed Oona's relinquishment of her independent career in reliance on the parties' agreed allocation of responsibilities.

235. Sid knowingly accepted, encouraged, and benefited from Oona's contributions over the course of more than a decade. Oona's efforts materially enhanced both the market value of the properties and their personal value to Sid, who enjoyed the benefits of the homes Oona helped create while repeatedly assuring her that they were hers in significant part. After receiving the full benefit of Oona's performance, however, Sid repudiated those promises, excluded Oona from the homes they built together, retained sole ownership and control of the properties, and sought to deprive Oona of the very interests he had promised her.

236. Under these circumstances, Sid's retention of the full beneficial ownership of the East 70th Street residence, the East 71st Street residence, the Montgomery Plaza apartment, and the Pagosa Springs ranch and houses would unjustly enrich him and would be against equity and good

conscience. Equity therefore requires the imposition of a constructive trust upon those properties, or upon Oona's equitable interests therein, for Oona's benefit.

**COUNT IV**

**Breach of Oral Agreement and Unjust Enrichment Under Colorado Law**

(against Defendant Sid Bass)

237. Plaintiff repeats and incorporates all preceding paragraphs and realleges them as if set forth fully herein.

238. To the extent Colorado law governs the parties' agreement or part of it, including Sid's promises concerning the Pagosa Springs ranch and residences, Sid and Oona entered into an enforceable oral agreement under Colorado law. In exchange for Oona's commitment to abandon her independent career and devote herself to the parties' shared domestic life—managing their households, overseeing the design, renovation, and maintenance of their homes, caring for Sid, and accompanying him wherever he chose or needed to be—Sid promised that Oona would share in substantial real property acquired during their relationship and would receive financial support sufficient to maintain those properties and their established lifestyle for the remainder of her life.

239. Oona fully performed her obligations under the agreement. For more than a decade, she gave up her independent career and devoted her time, labor, and skill to acquiring, designing, renovating, improving, and maintaining the parties' homes—including their Colorado ranch and residences—and to managing their households, caring for Sid, and supporting his personal, medical, charitable, and family needs and obligations.

240. Sid knowingly accepted and benefited from Oona's performance while repeatedly reaffirming his own obligations, and then materially breached the agreement by repudiating his promises, refusing to convey the promised property interests, refusing to provide the promised financial support, and displacing Oona from the homes the parties had built together.

241. Sid received the benefit of Oona's labor, skill, and sacrifice in acquiring, improving, and maintaining the parties' properties. Under the circumstances—including the parties' close, confidential relationship and their mutual understanding that Oona would share in the property—it would be unjust for Sid to retain that benefit without compensation.

242. As a direct and proximate result of Sid's breach and unjust enrichment, Oona is entitled to damages in an amount to be proven at trial, but not less than $400 million, together with restitution and such equitable relief as may be necessary and appropriate, including the imposition of a constructive trust upon the property in which Oona possesses contractual and equitable interests.

**COUNT V**

**Imposition of Constructive Trust on Property Transferred to or Acquired by Viafora Kress**

(against Defendant Althea Viafora Kress)

243. Plaintiff repeats and incorporates all preceding paragraphs and realleges them as if set forth fully herein.

244. As alleged above, Oona possesses substantial contractual or equitable interests in property accumulated, acquired, improved, maintained, or promised to her during her decade-long partnership with Sid. Those interests include property interests created by Sid's express promises and Oona's decade of performance in reliance upon them.

245. Those rights cannot be defeated merely by Sid and/or Viafora Kress transferring, gifting, retitling, purchasing, or otherwise placing property in Viafora Kress's name or possession. Before Viafora Kress entered Sid's life, Oona had already acquired rights arising from her relationship with Sid, Sid's repeated promises concerning the property they shared, and Oona's extensive performance and contributions in reliance upon those promises.

246. Upon information and belief, after entering Sid's life—and particularly after displacing Oona from the couple's homes—Viafora Kress caused, induced, accepted, or benefited

from transfers of property and expenditures of assets in which Oona possesses contractual or equitable rights. Those transfers include, upon information and belief, interests in real property, cash, securities, art, valuable personal property, and other assets acquired or transferred for Viafora Kress's benefit. The precise identity, value, source of funds, and present location of those assets are peculiarly within Defendants' knowledge and will be established through discovery.

247. Viafora Kress had actual knowledge of Oona's relationship with Sid and of the facts establishing Oona's claims to the property at the time Viafora Kress received or acquired such assets. Viafora Kress knew that Oona and Sid had shared their homes and finances for approximately a decade, that Oona had designed, renovated, managed, and maintained those homes, and that Oona claimed continuing rights in the property and financial provision Sid had promised her.

248. Upon information and belief, Viafora Kress did not provide reasonably equivalent value for property transferred to her from Sid or acquired for her benefit from assets subject to Oona's contractual or equitable interests. To the extent she received such property by gift or other gratuitous transfer, she is not a bona fide purchaser for value and cannot take the property free of Oona's preexisting equitable interests.

249. Permitting Viafora Kress to retain property derived from assets in which Oona has superior legal or equitable rights—particularly where Viafora Kress intentionally participated in inducing Sid to repudiate those rights—would unjustly enrich Viafora Kress and would be contrary to equity and good conscience.

250. Equity therefore requires the imposition of a constructive trust in Oona's favor upon all identifiable property presently held, owned, controlled, or beneficially enjoyed by Viafora Kress that was transferred from Sid or acquired with assets in which Oona possesses a contractual or

equitable interest, together with all traceable proceeds and substitutions thereof. Oona is further entitled to an accounting sufficient to identify and trace all such assets.

**COUNT VI**

**Tortious Interference with Contract**

(against Defendant Althea Viafora Kress)

251. Plaintiff repeats and incorporates all preceding paragraphs and realleges them as if set forth fully herein.

252. Oona and Sid entered into the valid and enforceable express oral agreement, made in New York, alleged above and in Count I. Pursuant to that agreement, Oona undertook to abandon her independent career and devote herself to the parties' shared life, and Sid promised in return that Oona would receive substantial interests in the property they acquired and developed together, lifelong financial support sufficient to maintain their established standard of living, and lifelong financial security for Oona's mother, Portia.

253. Viafora Kress had actual knowledge of the existence and essential terms of Oona and Sid's agreement. At minimum, Viafora Kress knew that Oona and Sid had lived together for nearly a decade as partners; that Oona occupied and managed their homes in New York, Texas, and Colorado; that Oona was treated by Sid's employees, family, and friends as his partner who had authority to speak on his behalf; and that Sid had undertaken substantial continuing financial and property obligations to Oona. Viafora Kress's own conduct—including her instructions concerning Oona's continued communications with Sid, Oona's possessions, Oona's access to the parties' residences, and her refusal to work with employees who had worked with Mercedes or Oona—demonstrates her knowledge of Oona's established position and rights.

254. With that knowledge, Viafora Kress intentionally procured and induced Sid to breach his agreement with Oona. Among other things, Viafora Kress cultivated a relationship with Sid beginning with a lunch in New York in late 2022, while his cognition and judgment were

deteriorating. She continued her interference with Sid's performance of his contractual obligations to Oona over the course of successive visits Sid made to New York; demanded that Sid cease communicating directly with Oona; directed the manner and timing of Oona's removal from the Colorado residence; demanded and directed the unlawful removal of Oona's possessions in Colorado and Texas; moved into the parties' shared homes; encouraged Sid to retreat from the financial and property commitments he had repeatedly made to Oona; and thereafter consolidated her control over Sid's communications, household, staff, and affairs.

255. Viafora Kress's interference was intentional and without justification. She was a stranger to Oona and Sid's agreement and acted to advance her own personal, romantic, social, and other interests by displacing Oona and appropriating for herself Oona's position, homes, lifestyle, and access to Sid's property that Oona had occupied and enjoyed pursuant to her agreement with Sid. Viafora Kress had no legitimate economic interest in causing Sid to breach obligations that predated her entry into his life.

256. Viafora Kress's interference was a direct, substantial, and but-for cause of Sid's breach. Before Viafora Kress entered Sid's life, Sid had honored and repeatedly reaffirmed his obligations to Oona for approximately a decade. Only after Viafora Kress groomed a relationship with Sid, displaced Oona, and began exercising control over Sid did Sid abruptly repudiate those obligations.

257. As a direct and proximate result of Viafora Kress's intentional interference, Oona has suffered substantial damages, including the loss of the property interests and lifelong financial support promised to her, consequential economic losses resulting from the decade she spent performing her obligations rather than pursuing an independent career, and other damages in an amount to be determined at trial, but not less than $400 million.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and grant the following relief:

i. Award Plaintiff damages for Defendant Sid Bass's breach of the parties' express oral agreement, in an amount to be established at trial, but not less than $400 million, together with such equitable relief as may be necessary and appropriate to enforce Defendant Bass's obligations with respect to the property interests promised to Plaintiff;

ii. Alternatively, award Plaintiff damages against Defendant Sid Bass under the doctrine of promissory estoppel, in an amount to be determined at trial, but not less than $400 million;

iii. Award Plaintiff damages against Defendant Viafora Kress for tortious interference with Plaintiff's contract with Defendant Sid Bass, in an amount to be established at trial, but not less than $400 million;

iv. Impose a constructive trust in Plaintiff's favor upon the East 70th Street residence, the East 71st Street residence, the Montgomery Plaza apartment in Fort Worth, and the Pagosa Springs ranch and houses, or upon Plaintiff's equitable interests therein;

v. Impose a constructive trust in Plaintiff's favor upon all property held, owned, controlled, or beneficially enjoyed by Defendant Viafora Kress that was transferred from Defendant Sid Bass or acquired with assets in which Plaintiff possesses a contractual or equitable interest, together with all traceable proceeds and substitutions thereof;

vi. Direct Defendants to provide an accounting sufficient to identify all assets transferred, gifted, conveyed, retitled, purchased, or otherwise provided to or for the benefit of Defendant Viafora Kress from the time she entered Defendant Sid Bass's life through the present;

vii. Award Plaintiff costs, disbursements, and expenses, together with attorneys' fees, expert witness fees, and such other litigation expenses as may be authorized by applicable law; and

viii. Such other and further relief as the Court deems just and proper.

Dated: August 31, 2026
New York, New York

Respectfully submitted,



Roberta A. Kaplan
Timothy S. Martin
Christopher R. Le Coney
Olivia P. Berci
KAPLAN MARTIN LLP
1133 Avenue of the Americas
New York, New York 10036

Tel.: (212) 316-9500
rkaplan@kaplanmartin.com
tmartin@kaplanmartin.com
cleconey@kaplanmartin.com
oberci@kaplanmartin.com

*Counsel for Plaintiff Oona O. Sperr*